# HUDDLESTON *v.* UNITED STATES

No. 72–1076.   Argued November 7, 1973—Decided March 26, 1974

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post,* p. 833.

*Harvey I. Saferstein* argued the cause and filed briefs for petitioner.

*Danny J. Boggs* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Assistant Attorney General Petersen,* and *Jerome M. Feit.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the issue whether 18 U. S. C. § 922 (a)(6),[1] declaring that it is unlawful knowingly to make a false statement "in connection with the acquisition . . . of any firearm . . . from a . . . licensed dealer," covers the redemption of a firearm from a pawnshop.

## I

On October 6, 1971, petitioner, William C. Huddleston, Jr., pawned his wife's Winchester 30–30-caliber rifle for $25 at a pawnshop in Oxnard, California. On the following October 15 and on December 28, he pawned at

---

[1] "§ 922.   Unlawful acts.

"(a) It shall be unlawful—

.          .          .          .          .

"(6) for any person in connection with the acquisition . . . of any firearm . . . from a . . . licensed dealer . . . knowingly to make any false or fictitious oral or written statement . . . intended or likely to deceive such . . . dealer . . . with respect to any fact material to the lawfulness of the sale or other disposition of such firearm . . . under the provisions of this chapter."

the same shop two other firearms, a Russian 7.62-caliber rifle and a Remington .22-caliber rifle, belonging to his wife. For these he received loans of $10 and $15, respectively. The owner of the pawnshop was a federally licensed firearms dealer.

Some weeks later, on February 1, 1972, and on March 10, Huddleston redeemed the weapons. In connection with each of the redemptions, the pawnbroker required petitioner to complete Treasury Form 4473, entitled "Firearms Transaction Record." This is a form used in the enforcement of the gun control provision of Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90–351, 82 Stat. 225, as amended by the Gun Control Act of 1968, Pub. L. 90–618, 82 Stat. 1213, of which the above-cited 18 U. S. C. § 922 (a) (6) is a part. Question 8b of the form is:

> "Have you been convicted in any court of a crime punishable by imprisonment for a term exceeding one year? (Note: The actual sentence given by the judge does not matter—a yes answer is necessary if the judge could have given a sentence of more than one year.)"

The question is derived from the statutory prohibition against a dealer's selling or otherwise disposing of a firearm to any person who "has been convicted in any court of . . . a crime punishable by imprisonment for a term exceeding one year." 18 U. S. C. § 922 (d)(1).[2] Petitioner answered "no" to Question 8b on each of the three

---

[2] "§ 922. Unlawful acts.

   .       .       .       .       .

"(d) It shall be unlawful for any . . . licensed dealer . . . to sell or otherwise dispose of any firearm . . . to any person knowing or having reasonable cause to believe that such person—

"(1) is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year."

Forms 4473. He then affixed his signature to each form's certification that the answers were true and correct, that he understood that a person who answers any of the questions in the affirmative is prohibited by federal law from "purchasing and/or possessing a firearm," and that he also understood that the making of any false statement with respect to the transaction is a crime punishable as a felony.

In fact, Huddleston, six years earlier, had been convicted in a California state court for writing checks without sufficient funds, an offense punishable under California law by a maximum term of 14 years.[3] This fact, if revealed to the pawnshop proprietor, would have precluded the proprietor from selling or otherwise disposing of any of the rifles to the petitioner because of the proscription in 18 U. S. C. § 922 (d)(1).

Huddleston was charged in a three-count indictment with violating 18 U. S. C. §§ 922 (a)(6) and 924 (a).[4] He moved to dismiss the indictment, in part on the ground that § 922 (a)(6) was never intended to apply, and should not apply, to a pawnor's redemption of a weapon he had pawned. This motion was denied. Petitioner then pleaded not guilty and waived a jury trial.

---

[3] Cal. Penal Code § 476a (1970). The California complaint against Huddleston was in six counts and contained an allegation that he had been convicted previously in the State of Iowa of an offense which, if committed in California, would have been a violation of § 476 of the California Penal Code. He was eventually sentenced on the check charge to 30 days in jail.

[4] "§ 924. Penalties.

"(a) Whoever violates any provision of this chapter or knowingly makes any false statement or representation with respect to the information required by the provisions of this chapter to be kept in the records of a person licensed under this chapter, . . . shall be fined not more than $5,000, or imprisoned not more than five years, or both, and shall become eligible for parole as the Board of Parole shall determine."

The Government's evidence consisted primarily of the three Treasury Forms 4473 Huddleston had signed; the record of his earlier California felony conviction; and the pawnbroker's federal license. A Government agent also testified that petitioner, after being arrested and advised of his rights, made statements admitting that he had known, when filling out the forms, that he was a felon and that he had lied each time when he answered Question 8b in the negative.

Huddleston testified in his own defense. He stated that he did not knowingly make a false statement; that he did not read the form and simply answered "no" upon prompting from the pawnbroker; and that he was unaware that his California conviction was punishable by a term exceeding one year.[5]

The District Judge found the petitioner guilty on all counts. He sentenced Huddleston to three concurrent three-year terms. The sentences were suspended, however, except for 20 days to be served on weekends. The United States Court of Appeals for the Ninth Circuit, by a divided vote, affirmed the conviction. 472 F. 2d 592 (1973). The dissenting judge agreed that the statute was constitutional as applied, but concluded that what Huddleston did was to "reacquire" the rifles, and that "reacquire" is not necessarily included within the statute's term "acquire." *Id.*, at 593. We granted certiorari, 411 U. S. 930 (1973), to resolve an existing conflict among the circuits on the issue whether the

---

[5] Huddleston at first testified that his California attorney and his probation officer there told him that when he completed his probation period and made restitution, "it would go on record as a misdemeanor," and that the attorney had told him he "couldn't get over a year." App. 37, 39. Upon inquiry by the court, he testified that when he was arraigned he thought he "could get more than one year," and was so informed. *Id.*, at 41.

prohibition against making false statements in connection with the acquisition of a firearm covers a firearm's redemption from a pawnshop.[6]

## II

Petitioner's assault on the statute under which he was convicted is two pronged. First, it is argued that both the statute's language and its legislative history indicate that Congress did not intend a pawnshop redemption of a firearm to be an "acquisition" covered by the statute. Second, it is said that even if Congress did intend a pawnshop redemption to be a covered "acquisition," the statute is so ambiguous that its construction is controlled by the maxim that ambiguity in a criminal statute is to be resolved in favor of the defendant.

We turn first to the language and structure of the Act. Reduced to a minimum, § 922 (a)(6) relates to any false statement made "in connection with the acquisition . . . of any firearm" from a licensed dealer and intended or likely to deceive the dealer "with respect to any fact material to the lawfulness of the sale or other disposition of such firearm."

Petitioner attaches great significance to the word "acquisition." He urges that it suggests only a sale-like transaction. Since Congress in § 922 (a)(6) did not use words of transfer or delivery, as it did in other sections of the Act, he argues that "acquisition" must have a narrower meaning than those terms. Moreover, since a pawn transaction is only a temporary bailment of personal property, with the pawnshop having merely a security interest in the pledged property, title or ownership is constant in the pawnor, and the pawn-

---

[6] In agreement with the Ninth Circuit's decision is *United States* v. *Beebe,* 467 F. 2d 222 (CA10 1972). To the contrary is *United States* v. *Laisure,* 460 F. 2d 709 (CA5 1972).

plus-redemption transaction is no more than an interruption in the pawnor's possession. The pawnor simply repossesses his own property, and he does not "acquire" any new title or interest in the object pawned. At most, he "reacquires" the object, and reacquisition, as the dissenting judge in the Court of Appeals noted, is not necessarily included in the statutory term "acquisition."

On its face, this argument might be said to have some force. A careful look at the statutory language and at complementary provisions of the Act, however, convinces us that the asserted ambiguity is contrived. Petitioner is mistaken in focusing solely on the term "acquisition" and in enshrouding it with an extra-statutory "legal title" or "ownership" analysis. The word "acquire" is defined to mean simply "to come into possession, control, or power of disposal of." Webster's New International Dictionary (3d ed., 1966, unabridged); *United States* v. *Laisure,* 460 F. 2d 709, 712 n. 3 (CA5 1972). There is no intimation here that title or ownership would be necessary for possession, or control, or disposal power, and there is nothing else in the statute that justifies the imposition of that gloss. Moreover, a full reading of § 922 (a) (6) clearly demonstrates that the false statements that are prohibited are those made with respect to the lawfulness of the sale "or other disposition" of a firearm by a licensed dealer. The word "acquisition," therefore, cannot be considered apart from the phrase "sale or other disposition." As the Government suggests, and indeed as the petitioner implicitly reasoned at oral argument, Tr. of Oral Arg. 11, if the pawnbroker "sells" or "disposes" under § 922 (a)(6), the transferee necessarily "acquires." These words, as used in the statute, are correlatives. The focus of our inquiry, therefore, should be to determine whether a "sale or other disposition" of a firearm by a pawnbroker encompasses the redemption of the firearm by a pawnor.

Clearly, a redemption is not a "sale" for the simple reason that a sale has definite connotations of ownership and title. Some "other disposition" of a firearm, however, could easily encompass a pawnshop redemption. We believe that it does.

It is the dealer who sells or disposes of the firearm. The statute defines the dealer to be:

"(A) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) *any person who is a pawnbroker.*" 18 U. S. C. § 921 (a)(11) (emphasis supplied).

It defines a "pawnbroker" as "any person whose business or occupation includes the taking or receiving, *by way of pledge or pawn,* of any firearm or ammunition as security for the payment or repayment of money." 18 U. S. C. § 921 (a)(12) (emphasis supplied).

These definitions surely suggest that a "sale or other disposition" of a firearm in a pawnshop is covered by the statute. This, of course, does not of itself resolve the question as to exactly what "other disposition" by a pawnbroker is included. It should be apparent, however, that if Congress had intended to include only a pawnbroker's default sales of pledged or pawned goods, or his wholesale and retail sales of nonpawned goods, and to exclude the *redemption* of pawned articles, then the explicit inclusion of the pawnbroker in the definition of "dealer" would serve no purpose, since part (A) of the definition, covering wholesale and retail sales, would otherwise reach all such sales. *United States* v. *Rosen,* 352 F. Supp. 727, 729 (Idaho 1973). At oral argument counsel suggested that the specific reference to a pawnbroker might have been intended to include "disposition"

by barter, swap, trade, or gift. Tr. of Oral Arg. 5–7. This interpretation strains belief. Trades or gifts are not peculiar to pawnbrokers. Wholesalers and retailers may indulge in such dispositions. There is nothing in the legislative history to indicate that this interpretation prompted the specific mention of a pawnbroker in part (C) of the definition. To the contrary, the committee reports indicate that part (C) "specifically provides that a pawnbroker *dealing in firearms* shall be considered a dealer." H. R. Rep. No. 1577, 90th Cong., 2d Sess., 11 (1968) (emphasis supplied). See also S. Rep. No. 1501, 90th Cong., 2d Sess., 30 (1968).

We also cannot ignore the explicit reference to a firearm transaction "by way of pledge or pawn" in the statutory definition of "pawnbroker" in § 921 (a)(12). Had Congress' desire been to exempt a transaction of this kind, it would have artfully worded the definition so as to exclude it. We are equally impressed by Congress' failure to exempt redemptive transactions from the prohibitions of the Act when it so carefully carved out exceptions for a dealer "returning a firearm" and for an individual mailing a firearm to a dealer "for the sole purpose of repair or customizing." § 922 (a)(2)(A). Petitioner contends that a redemptive transaction is no different from the return of a gun left for repair. His argument is that the pawned weapon is simply "returned" to the individual who left it and represents a mere restoration to its original status. We believe, however, that it was not unreasonable for Congress to choose to view the pawn transaction as something more than the mere interruption in possession typical of repair. The fact that Congress thought it necessary specifically to exempt the repair transaction indicates that it otherwise would have been covered and, if this were so, clearly a pawn transaction likewise would be covered.

Other provisions of the Act also make it clear that the statute generally covers all transfers of firearms by dealers to recipients. Section 922 (a)(1) makes it unlawful for any person, except a licensed importer, manufacturer, or dealer, to engage in the business of "dealing" in firearms, or in the course of such business "to ship, transport, or receive any firearm." Section 922 (b)(1) makes it unlawful for a dealer "to sell or deliver" firearms of specified types to persons under 18 or 21 years of age. Section 922 (b)(2) makes it unlawful for a dealer to "sell or deliver" a weapon to a person in any State where "at the place of sale, delivery or other disposition," the transfer would violate local law. Section 922 (d) makes it unlawful for a dealer "to sell or otherwise dispose of" a firearm to a person under a felony indictment, a felon, a fugitive, a narcotic addict, or a mental defective. Section 923 (g) requires that each licensed dealer maintain "records of importation, production, shipment, receipt, sale, or other disposition, of firearms."

In sum, the word "acquisition," as used in § 922 (a)(6), is not ambiguous, but clearly includes any person, by definition, who "come[s] into possession, control, or power of disposal" of a firearm. As noted above, "acquisition" and "sale or other disposition" are correlatives. It is reasonable to conclude that a pawnbroker might "dispose" of a firearm through a redemptive transaction. And because Congress explicitly included pawnbrokers in the Act, explicitly mentioned pledge and pawn transactions involving firearms, and clearly failed to include them among the statutory exceptions, we are not at liberty to tamper with the obvious reach of the statute in proscribing the conduct in which the petitioner engaged.

## III

The legislative history, too, supports this reading of the statute. This is apparent from the aims and purposes of the Act and from the method Congress adopted to achieve those objectives. When Congress enacted the provisions under which petitioner was convicted, it was concerned with the widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest. Pub. L. 90–351, § 1201, 82 Stat. 236, as amended by Pub. L. 90–618, § 301 (a)(1), 82 Stat. 1236, 18 U. S. C. App. § 1201. Congress determined that the ease with which firearms could be obtained contributed significantly to the prevalence of lawlessness and violent crime in the United States. S. Rep. No. 1097, 90th Cong., 2d Sess., 108 (1968). The principal purpose of the federal gun control legislation, therefore, was to curb crime by keeping "firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968).

Title IV of the Omnibus Crime Control and Safe Streets Act of 1968 and the Gun Control Act of 1968 are thus aimed at restricting public access to firearms. Commerce in firearms is channeled through federally licensed importers, manufacturers, and dealers in an attempt to halt mail-order and interstate consumer traffic in these weapons. The principal agent of federal enforcement is the dealer. He is licensed, §§ 922 (a)(1) and 923 (a); he is required to keep records of "sale . . . or other disposition," § 923 (g); and he is subject to a criminal penalty for disposing of a weapon contrary to the provisions of the Act, § 924.

Section 922 (a)(6), the provision under which peti-

tioner was convicted, was enacted as a means of providing adequate and truthful information about firearms transactions. Information drawn from records kept by dealers was a prime guarantee of the Act's effectiveness in keeping "these lethal weapons out of the hands of criminals, drug addicts, mentally disordered persons, juveniles, and other persons whose possession of them is too high a price in danger to us all to allow." 114 Cong. Rec. 13219 (1968) (remarks of Sen. Tydings). Thus, any false statement with respect to the eligibility of a person to obtain a firearm from a licensed dealer was made subject to a criminal penalty.

From this outline of the Act, it is apparent that the focus of the federal scheme is the federally licensed firearms dealer, at least insofar as the Act directly controls access to weapons by users. Firearms are channeled through dealers to eliminate the mail order and the generally widespread commerce in them, and to insure that, in the course of sales or other dispositions by these dealers, weapons could not be obtained by individuals whose possession of them would be contrary to the public interest. Thus, the conclusion we reached above with respect to the language and structure of the Act, that firearms redemptions in pawnshops are covered, is entirely consonant with the achievement of this congressional objective and method of enforcing the Act.

Moreover, as was said in *United States* v. *Bramblett,* 348 U. S. 503, 507 (1955), "There is no indication in either the committee reports or in the congressional debates that the scope of the statute was to be in any way restricted" (footnotes omitted). Indeed, the committee reports indicate that the proscription under § 922 (d) on the sale or other disposition of a firearm to a felon "goes to all types of sales or dispositions—

over-the-counter as well as mail order."[7]   S. Rep. No.
1097, 90th Cong., 2d Sess., 115 (1968).   See S. Rep.
No. 1501, 90th Cong., 2d Sess., 34 (1968).   As far as
the parties have informed us, and as far as our inde-
pendent research has revealed, there is no discussion of
the actual meaning of "acquisition" or of "sale or other
disposition" in the legislative history.   Previous legisla-
tion relating to the particular term "other disposition"
sheds some light, however, and prudence calls on us to
look to it in ascertaining the legislative purpose.   *United
States* v. *Katz*, 271 U. S. 354, 357 (1926).   The term
apparently had its origin in § 1 (k) of the National Fire-
arms Act, Pub. L. 474, 48 Stat. 1236 (1934).   That
Act set certain conditions on the "transfer" of machine
guns and other dangerous weapons.   As defined by the
Act, "transfer" meant "to sell, assign, pledge, lease, loan,
give away, or otherwise dispose of."   The term "other-
wise dispose of" in that context was aimed at providing

---

[7] James V. Bennett, then Director of the Federal Bureau of Prisons,
in Senate testimony offered a "case study" vividly illustrating non-
sale situations that would qualify as a firearms "disposition" or
"acquisition."   One of his illustrations was the following:

"On September 26, 1958, a 20-year-old youth shot and seriously
wounded a teller during the course of a bank robbery in St. Paul;
only a week previously he had bought the revolver, a .357 Smith &
Wesson, in a Minneapolis sporting goods store, pawned it the same
day, and on the day of the robbery redeemed it with money obtained
from check forgeries."

Mr. Bennett concluded his testimony with the observation, "No
responsible and thoughtful citizen can, in my opinion, seriously object
to measures which would discourage youngsters, the mentally ill, and
criminals from coming into possession of handguns."   Hearings before
the Subcommittee to Investigate Juvenile Delinquency of the Senate
Committee on the Judiciary, 88th Cong., 1st Sess., pt. 14, pp. 3369,
3377 (1963).

maximum coverage. The interpretation we adopt here
accomplishes the same objective.[8]

There also can be no doubt of Congress' intention to
deprive the juvenile, the mentally incompetent, the
criminal, and the fugitive of the use of firearms. Senator
Tydings stated:

> "Title IV, the concealed weapons amendment, is
> a very limited, stripped-down, bare-minimum gun-
> traffic control bill, primarily designed to reduce
> access to handguns for criminals, juveniles, and
> fugitives . . . . I can fairly say that this concealed
> weapons amendment does not significantly incon-
> venience hunters and sportsmen in any way. The
> people it does frustrate are the juveniles, felons, and
> fugitives who today can, with total anonymity and
> impunity, obtain guns by mail or by crossing into
> neighboring States with lax or no gun laws at all,
> regardless of the law of their own State." 114
> Cong. Rec. 13647 (1968).

---

[8] Testimony by then Attorney General Ramsey Clark also supports
the rejection of petitioner's suggestion that the language of the stat-
ute be given a restrictive meaning:

"Mr. Donohue. Do you not think, Mr. Attorney General, to
attain the real objective and purpose of this bill, it should not only
deal with the sale, but whoever sells or delivers?

"Mr. Clark. It covers delivery, too.

"Mr. Donohue. Where?

"Mr. Clark. Well, generally, through the bill when you talk
about—well, it would be unlawful for any licensed importer to sell
or deliver. Any licensed dealer to sell or deliver.

"Mr. Donohue. It is not restricted to just sale for consideration?

"Mr. Clark. No. The delivery, too."

Hearings on an Anti-Crime Program before Subcommittee No. 5 of
the House Committee on the Judiciary, 90th Cong., 1st Sess., 260
(1967).

Congressman Celler, the House Manager, stated:

"Mr. Chairman, none of us who support Federal firearms controls believe that any bill or any system of control can guarantee that society will be safe from firearms misuse. But we are convinced that a strengthened system can significantly contribute to reducing the danger of crime in the United States. No one can dispute the need to prevent drug addicts, mental incompetents, persons with a history of mental disturbances, and persons convicted of certain offenses, from buying, owning, or possessing firearms. This bill seeks to maximize the possibility of keeping firearms out of the hands of such persons." *Id.*, at 21784.

Congressman McCulloch, a senior member of the House Committee on the Judiciary, in referring specifically to § 922 (a)(6), stated, "[The bill] makes it unlawful . . . [f]or any person, in connection with obtaining a firearm or ammunition from a licensee, to make a false representation material to such acquisition." *Id.*, at 21789.[9] Given these statements of congressional purpose, it would be unwarranted to except pawnship redemptions

---

[9] It should be apparent from these statements that Congress was not so much concerned with guaranteeing no interference with the ownership of weapons as it was in distinguishing between law-abiding citizens and those whose possession of weapons would be contrary to the public interest. Hunting, target practice, gun collecting, and the legitimate use of guns for individual protection are not proscribed by the Act. Ownership of a weapon, however, may be interfered with by seizure and forfeiture under the Act for any violation of its provisions. Section 924 (d) incorporates the seizure and forfeiture provisions of the Internal Revenue Code when there is any violation of the provisions of the chapter or any rule or regulation thereunder. The Act itself thus contemplates interference with the ownership of weapons when those weapons fall into the hands of juveniles, criminals, drug addicts, and mental incompetents.

when, by virtue of the statutory language itself, such redemptions would be covered. Otherwise every evil Congress hoped to cure would continue unabated.[10]

---

[10] What few references there are to pawnbrokers in the debates indicate that Congress was definitely interested in curbing firearms traffic between pawnbrokers and convicted felons. Senator Tydings, a strong proponent of the bill which became the Act, expressed his concern when he compared the bill to a proposal that was offered as an alternative:

"[O]ne reading through the amendment for the first time would assume that pawnbrokers are covered by the critically important provisions of the affidavit-waiting period procedure. But, if a pawnbroker only receives secondhand weapons as security for the repayment of a loan and does not deal in new firearms, he is not transporting, shipping, or receiving a firearm in interstate or foreign commerce. Used weapons presumably will have come to rest in the hands of the borrower, and the transaction will be wholly intrastate. Such a pawnbroker would not need a Federal firearms license to conduct over-the-counter transactions in firearms. And, accordingly, he would not be a 'licensed dealer' required to comply with the affidavit-waiting period procedure for his over-the-counter sales in handguns. Now, if this analysis is correct, and I believe it is, this is no small omission. Surely the great bulk of criminally irresponsible purchasers of pistols and revolvers buy their weapons secondhand, and many of them from pawnshops. We all have seen the virtual arsenals displayed in the windows of pawnshop dealers in all of the major cities of the country. To say that we have effectively regulated traffic in firearms when we will not have touched the great bulk of these pawnbroker operations is a complete and utter hypocrisy." 114 Cong. Rec. 13222 (1968).

See also Memorandum placed in the record by Senator Dodd. *Id.*, at 13320. Senator Tydings made this further comparison:

"[I]t is obvious that many persons with criminal records purchase from pawnbrokers, and there are many occasions when the pawnbroker knows the criminal background of the client. Under Amendment No. 708, many of these pawnbrokers will not be required to be licensed. They would not need to comply with the affidavit procedure. And even if they were licensed, there would be no prohibition on their selling firearms to known criminals. Under

## IV

Petitioner urges that the intention to include pawn redemptions is so ambiguous and uncertain that the statute should be narrowly construed in his favor. Reliance is placed upon the maxim that an "ambiguity

---

title IV, on the other hand, all of these pawnbrokers would be required to be licensed—because all dealers and manufacturers must be licensed whether or not they ship, receive, or transport in commerce—and all of them would be under direct Federal sanction not to sell firearms to known criminals. I ask you, which bill is likely to be more effective?" *Id.*, at 13223.

It must be conceded that these remarks refer to "selling" firearms, but we do not credit this fact as significant for purposes of determining whether a pawnshop redemption is covered by the Act. The plain language of the statute as enacted prohibits a dealer from "selling or disposing of" firearms to felons, and petitioner's counsel at oral argument intimated that a pawnbroker, under this language, could dispose of a firearm other than by sale and be covered by the Act. Tr. of Oral Arg. 4–5. References in the legislative debate, moreover, are replete with shorthand language and this is merely an instance of its use. Had the legislators been engaged in a colloquy on the actual meaning of "sale or other disposition of," we might be more receptive to the interpretation proffered by the petitioner.

We also note that the President of the Pawnbrokers' Association of the City of New York testified during congressional hearings that almost all firearm transactions by pawnshops are by pledge and redemption, and contended, therefore, that pawnbrokers should not be included as dealers under the Act. Hearings on a Federal Firearms Act before the Subcommittee to Investigate Juvenile Delinquency of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., 1062–1065 (1967). Thus, informed of the fact that almost all firearms transactions by pawnbrokers were through pledge and redemption, and faced with the argument that pawnbrokers should not be considered as "dealers," Congress clearly chose to retain pawnbrokers as firearms dealers.

Finally, the language of the committee reports indicates that a "sale or disposition" includes "all types of sales or dispositions." S. Rep. No. 1097, 90th Cong., 2d Sess., 115 (1968).

concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis* v. *United States,* 401 U. S. 808, 812 (1971); *United States* v. *Bass,* 404 U. S. 336, 347 (1971). This rule of narrow construction is rooted in the concern of the law for individual rights, and in the belief that fair warning should be accorded as to what conduct is criminal and punishable by deprivation of liberty or property. *United States* v. *Wiltberger,* 5 Wheat. 76, 95 (1820); *United States* v. *Bass,* 404 U. S., at 348. The rule is also the product of an awareness that legislators and not the courts should define criminal activity. Zeal in forwarding these laudable policies, however, must not be permitted to shadow the understanding that "[s]ound rules of statutory interpretation exist to discover and not to direct the Congressional will." *United States ex rel. Marcus* v. *Hess,* 317 U. S. 537, 542 (1943). Although penal laws are to be construed strictly, they "ought not to be construed so strictly as to defeat the obvious intention of the legislature." *American Fur Co.* v. *United States,* 2 Pet. 358, 367 (1829); *United States* v. *Wiltberger, supra; United States* v. *Morris,* 14 Pet. 464, 475 (1840); *United States* v. *Lacher,* 134 U. S. 624 (1890); *United States* v. *Bramblett,* 348 U. S., at 510; *United States* v. *Bass,* 404 U. S., at 351.

We perceive no grievous ambiguity or uncertainty in the language and structure of the Act. The statute in question clearly proscribes petitioner's conduct and accorded him fair warning of the sanctions the law placed on that conduct. Huddleston was not short of notice that his actions were unlawful. The question he answered untruthfully was preceded by a warning in boldface type that "an untruthful answer may subject you to criminal prosecution." The question itself was forthright and direct, stating that it was concerned with conviction of a crime punishable by imprisonment for a

term exceeding one year and that this meant the term which could have been imposed and not the sentence actually given. Finally, petitioner was required to certify by his signature that his answers were true and correct and that he understood that "the making of any false oral or written statement . . . with respect to this transaction is a crime punishable as a felony." This warning also was in boldface type. Clearly, petitioner had adequate notice and warning of the consequences of his action.

Our reading of the statute cannot be viewed as judicial usurpation of the legislative function. The statute's language reveals an unmistakable attempt to include pawnshop transactions, by pledge or pawn, among the transactions covered by the Act. And Congress unquestionably made it unlawful for dealers, including pawnbrokers, "to sell or otherwise dispose of any firearm" to a convicted felon, a juvenile, a drug addict, or a mental defective. § 922 (d). Under these circumstances we will not blindly incant the rule of lenity to "destroy the spirit and force of the law which the legislature intended to [and did] enact." *American Tobacco Co.* v. *Werckmeister,* 207 U. S. 284, 293 (1907); *United States* v. *Katz,* 271 U. S., at 357.[11]

---

[11] The decision today does not ignore the admonition of the Court in *United States* v. *Bass,* 404 U. S. 336, 349 (1971), that "[i]n traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." This statute did affect the federal balance and it did so intentionally. As Senator Tydings explained:

"This concealed weapons amendment does not violate any State's right to make its own gun laws. Quite the contrary, title IV provides the controls on interstate gun traffic which only the Federal Government can apply, and without which no State gun law is worth the paper it is written on. . . . Without such Federal assistance,

## V

The petitioner suggests, lastly, that the application of § 922 (a)(6) to a pawn redemption would raise constitutional questions of some moment, and that these would not arise if the statute were narrowly construed. We fail to see the presence of issues of that import. There was no taking of Huddleston's property without just compensation. The rifles, in fact, were not his but his wife's. Moreover, Congress has determined that a convicted felon may not lawfully obtain weapons of that kind. Nor were petitioner's false answers in any way coerced. *United States* v. *Knox,* 396 U. S. 77, 79 (1969); *Bryson* v. *United States,* 396 U. S. 64, 72 (1969). Finally, no interstate commerce nexus need be demonstrated. Congress intended, and properly so, that §§ 922 (a)(6) and (d)(1), in contrast to 18 U. S. C. App. § 1202 (a)(1), see *United States* v. *Bass, supra,* were to reach transactions that are wholly intrastate, as the Court of Appeals correctly reasoned, "on the theory that such transactions affect interstate commerce." 472 F. 2d, at 593. See also *United States* v. *Menna,* 451 F. 2d 982, 984 (CA9 1971), cert. denied, 405 U. S. 963 (1972), and *United States* v. *O'Neill,* 467 F. 2d 1372, 1373–1374 (CA2 1972).

We affirm the judgment of the Court of Appeals.

*It is so ordered.*

MR. JUSTICE DOUGLAS, dissenting.

This case presents a minor version of the problem confronting the Court in *Rosenberg* v. *United States,* 346 U. S. 273. That case involved an ambiguity in a criminal law, an ambiguity that normally would be resolved

---

any State gun law can be subverted by any child, fugitive, or felon who orders a gun by mail or buys one in a neighboring State which has lax gun laws." 114 Cong. Rec. 13647 (1968).

in favor of life. A split Court in a tense period of American history unhappily resolved the ambiguity against life—a break with history which the conscience of our people will sometime rectify.

The present case is a minor species of the same genus. A person who took his gun to a pawnshop for a loan undoubtedly had "acquired" the gun prior to that time. It is therefore odd to think of the "acquisition" occurring when he redeemed his own gun from the pawnshop. I agree with the Court of Appeals for the Fifth Circuit, *United States* v. *Laisure*, 460 F. 2d 709, that the ambiguity should be resolved in favor of the accused. That is what we have quite consistently done, except in *Rosenberg,* in the past. See *United States* v. *Bass,* 404 U. S. 336, 347–348, and cases cited.*

---

*Civil cases cited by the Court, *e. g. American Tobacco Co.* v. *Werckmeister,* 207 U. S. 284, 293, are wide of the mark. For application of a law that sends people to prison for years where Congress has not made it clear they should be there, *United States* v. *Bass, supra,* at 346, is only another device as lacking in due process as Caligula's practice of printing the laws in small print and placing them so high on a wall that the ordinary man did not receive fair warning.

"When taxes of this kind had been proclaimed, but not published in writing, inasmuch as many offenses were committed through ignorance of the letter of the law, he at last, on the urgent demand of the people, had the law posted up, but in a very narrow place and in excessively small letters, to prevent the making of a copy." Suetonius, The Lives of the Twelve Caesars 192 (Modern Lib. ed. 1931).