BINGHAM, LTD.

v.

UNITED STATES of America.

Civ. A. No. C82–458A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Aug. 17, 1982.

Joseph H. King, Jr., Atlanta, Ga., for plaintiff.

Anthony L. Cochran, Asst. U. S. Atty., Atlanta, Ga., for defendant.

## ORDER

RICHARD C. FREEMAN, District Judge.

This declaratory judgment action, 28 U.S.C. § 2201, presents the question whether the manufacturer and seller of a bullet that explodes on impact must apply for an explosives manufacturers and dealers license (hereinafter "explosives license") pursuant to Title XI of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 841–848 (hereinafter "Act"), and the applicable regulation, 27 C.F.R. § 55.41. The action is before the court on cross motions for summary judgment. Rule 56, Fed.R. Civ.P.

\* \* \*

The relevant facts are not in dispute.[1] From 1979 to the present, the plaintiff, Bingham, Ltd. (hereinafter "Bingham"), which is presently licensed as a manufacturer of small arms ammunition, see 18 U.S.C. § 921 et seq., has made and sold a certain .22 caliber cartridge, known as "devastator" ammunition, that is designed to explode upon impact. Each "devastator" cartridge contains two separate explosive charges: (1) the base of the shell holds a propellant, which, when the cartridge is fired, forces the bullet out of the shell, down the length of the barrel, and into flight; (2) the tip of the bullet holds a small

---

1. This statement of the facts shall serve as the findings of fact required by Rules 52(a) and 49(b), Fed.R.Civ.P., in an order rendering judgment on the merits against a plaintiff.

cannister of lead azide, which explodes when the bullet strikes an object. This explosion upon impact shatters the bullet into fragments, and, by preventing the bullet from passing through or richocheting off of the object it strikes, delivers what Bingham calls "the full stopping force of the ammunition." Plaintiff's Statement of Material Facts at ¶ 3; see Defendant's Statement of Material Facts at ¶¶ 3 and 4.

Bingham's manufacturing process includes the insertion of the lead azide cannisters into the tips of the bullets. However, Bingham itself does not fill the cannisters with the lead azide; instead, the cannisters are purchased already loaded with the explosives from an explosives manufacturer.

Until October 1981, Bingham sold its "devastator" cartridges to ammunition distributors and wholesalers throughout the country, to some police agencies, and, occasionally, to foreign buyers. Bingham reduced the volume of its sales of the cartridges after it received a letter, dated October 6, 1981, from Mr. Dee Flynn, Regional Regulatory Administrator of the Bureau of Alcohol, Tobacco and Firearms, Department of the Treasury (hereinafter "Bureau"), advising Bingham that the lead azide cannisters were explosives subject to regulation pursuant to the Act and that the Bureau would consider any further sales of the cannisters without the required explosives license a willful violation of law. Since its receipt of that letter, Bingham has sold the "devastator" cartridges only to government agencies, in accordance with the exemption provided in section 845(a)(3) of the Act.[2]

In this action, Bingham seeks a declaration that it qualifies for an exemption found in section 845(a)(4), which provides that the Act's licensing requirements "shall not apply to . . . (4) small arms ammunition and components thereof." The Act defines neither "small arms ammunition" nor "components thereof."[3] Although Bingham admits that lead azide is an explosive material within the definitions provided in section 841(c) and (d) of the Act, it argues that once the lead azide is placed inside a cannister destined for use in the tip of a bullet, the cannister becomes a component of small arms ammunition within the meaning of

**2.** The plaintiff at first sought a preliminary injunction, see Motion for Interlocutory Relief and Brief in Support Thereof at 2. Accordingly, on March 24, 1982, this court held a hearing, in which it heard the testimony of Mr. Stanford Brygider, president and principal stockholder of the plaintiff, and of Mr. Dee Flynn, Regional Regulatory Administrator of the Bureau of Alcohol, Tobacco and Firearms. After reviewing the testimony in that hearing, the court concludes that while the evidence presented provided helpful technical background information, it revealed no disputed questions of fact. Any differences of opinion concerned only questions of law. See, e.g., Transcript at 21–24. The motion for preliminary injunction was withdrawn following the hearing.

Both parties assert that there are no issues of fact and base their motions on facts shown in the record, including the transcript of the hearing.

**3.** The Bureau, pursuant to the rule-making authority delegated in 18 U.S.C. § 847, has defined "ammunition" for the purpose of determining exemptions from the explosives licensing requirements to mean "small arms ammunition or cartridge cases, primers, bullets, or smokeless propellants designed for use in small arms." 27 C.F.R. § 55.11 [formerly 27 C.F.R. § 181.11; see 46 Fed.Reg. 40382 (1981)].

Defendant contends that this definition excludes the lead azide cannisters from the exemption for small arms ammunition and that such a definition is reasonably related to the legislative purposes of the explosives licensing scheme and therefore valid. Bingham first argues that this regulation "has nothing to do with the Explosives statute; it was promulgated under the Gun Control Act of 1968 . . . ." Brief in Support of Plaintiff's Motion for Summary Judgment at 3. Bingham's argument is groundless. This definition of ammunition is found in 27 C.F.R. Part 55, which is entitled "Commerce in Explosives" and which contains regulations designed to "implement Title XI, Regulation of Explosives, . . . of the Organized Crime Control Act of 1970." 27 C.F.R. § 55.1. Bingham also argues that the definition "does not exclude any sub-components of the listed items" and that "clearly the lead azide cannisters are part of a 'bullet.'" Brief in Support of Plaintiff's Motion for Summary Judgment at 3. Because the court holds that section 845(a)(4) provides no exemption for the manufacture of Bingham's "devastator" bullet, see infra at 8, the court concludes that the definition in the regulation as interpreted by the Bureau is in accord with the provisions of the Act.

section 845(a)(4). Bingham thus contends that since the plain meaning of "component" is "part," anything it uses as a part of small arms ammunition is within the exemption.

Defendant's principal argument is that Congress intended that section 845(a)(4) exempt "sportsmen who load their own shells" and that traditionally such sportsmen have not inserted explosives like lead azide into bullets so that they will explode on impact. Brief in Support of United States' Summary Judgment Motion at 4. Defendant thus asserts that "component" must be read to exempt only parts traditionally or customarily used in small arms ammunition.

\* \* \*

■ Sale of explosives without the license required by the Act is a crime punishable by up to a $10,000 fine or ten years' imprisonment. 18 U.S.C. § 844(a). The construction of a criminal statute is guided by several principles. First, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). This "rule of lenity" grew out of a concern for individual liberty and a belief that one should not be punished by loss of liberty unless the law has provided fair warning of what conduct will be considered criminal. *Huddleston v. United States*, 415 U.S. 814, 831, 94 S.Ct. 1262, 1271, 39 L.Ed.2d 782 (1974). However, the construction of a criminal statute must not defeat the clear intention of the legislature. *Barrett v. United States*, 423 U.S. 212, 218, 96 S.Ct. 498, 502, 46 L.Ed.2d 450 (1976); *United States v. Levy*, 579 F.2d 1332, 1337 (5th Cir. 1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1243, 59 L.Ed.2d 471 (1979).

Second, courts must interpret words in accordance with "their ordinary, contemporary, common meaning" and must look specifically to the "ordinary meaning of the term ... at the time Congress enacted the statute." *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). The court must therefore examine the legislative history of the Act to discover what Congress in 1970 considered to be the ordinary meaning of the word "component" in section 845(a)(4) and to determine whether that meaning reasonably comports with the purposes of the Act. *See United States v. Scrimgeour*, 636 F.2d 1019, 1022–24 (5th Cir. 1981), *cert. denied*, 454 U.S. 878, 102 S.Ct. 359, 70 L.Ed.2d 188 (1981) (consideration of legislative history to determine meaning of words is proper, even though meaning appears to be plain).

\* \* \*

■ The legislative history of the Act discloses that Congress intended to regulate closely all manufacture, sale, transportation, and storage of dangerous explosives and to provide only very narrow exemptions from that regulation. In response to a rash of terrorist bombings in the late 1960s, several bills proposing explosives licensing were introduced in 1970 in the House of Representatives (H.R. 16699, H.R. 17154, and H.R. 18573) and were the subject of five days of hearings. *See Explosives Control: Hearings Before Subcommittee No. 5 of the House of Representatives Committee on the Judiciary*, 91st Cong., 2d Sess. Ser. No. 29 (1970) (hereinafter "*Explosives Control Hearings*"). Although the House passed none of these bills, provisions that were "derived" from them became Title XI of the Senate bill, S. 30, that was enacted as the Organized Crime Control Act of 1970, Pub.L.No.91–452, 84 Stat. 922, 952, H.R. Rep.No.91–1549, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 4007, 4011 (hereinafter "House Report"). In Title XI's statement of purpose, Congress declared an intent "to protect interstate and foreign commerce against interference and interruption by reducing the hazards to persons and property from misuse and unsafe or insecure storage of explosive materials." Pub.L.No.91–452, § 1101, 84 Stat. 952 (uncodified). Comments by sponsors and supporters of the House bills indicate that Congress' primary concern was to keep explosives out of the hands of persons who would likely use them for terrorist purposes but, at the same time, to ensure that its licensing scheme would not

burden persons who use explosives for industrial, mining, agricultural, or other peaceful and legitimate purposes. *E.g., Explosives Control Hearings* at 282–86 (statement and testimony of Rep. Brotzman), 296–302 (statement and testimony of Rep. Wylie), and 319–20 (statement of Rep. Brown).

Much of the testimony produced during the hearings involved possible methods for exempting two groups from the licensing requirements. Participants in the sport of firing muzzle loading rifles and other antique firearms feared that the Act would require them to endure unnecessary burdens in order to purchase and store even relatively small amounts of black powder, which is commonly used as a propellant in those weapons. *E.g., id.* at 265–74 (statements and testimony of V. Goodwin and N. Knox). Persons who engage in target shooting or hunting and who, for reasons of economy or shooting precision, prefer to handload their own ammunition feared that the licensing provisions would unnecessarily burden their ability to obtain black powder and smokeless propellants, both of which are commonly used as propellants in handloaded ammunition. *E.g., id.* at 269–74 (statement of N. Knox).

Two methods of exempting muzzle loading enthusiasts and handloaders were discussed in the hearings. One method would have excluded black powder and smokeless propellants from the definition of "explosives" in section 841(d). *See id.* at 273 (statement of N. Knox). Congress ultimately enacted the other suggested method, which employed a broad definition of explosives and a set of narrowly drawn exemptions, including two subsections that benefited the sporting groups. Muzzle loading enthusiasts are now protected by the exemption in section 845(a)(5) for black powder and several other explosive materials used "solely for sporting, recreational, or cultural purposes in antique firearms." Handloaders are protected by the section 845(a)(4) exemption for "small arms ammunition and components thereof." The House Report stated that both subsections were designed specifically to exempt explo-

sives "used by 'handloaders' for sporting purposes." House Report, U.S.Code Cong. & Ad.News at 4047. Significantly, no testimony, statement, or report suggests that Congress considered any other reason for the section 845(a)(4) exemption.

The legislative history thus demonstrates that Congress intended that the Act have a very broad reach, encompassing all types of explosives, and that the exemption for "small arms ammunition and components thereof" be a narrow one. That history also provides sufficient evidence that when Congress used the term "component," it intended to refer only to parts traditionally used in ammunition for sporting purposes and not to ammunition like the "devastator" cartridge.

. First, although no discussion during the hearings dealt specifically with the meaning of "component," Congress did have in mind a particular meaning for "small arms ammunition." Mr. Hollis Dole, an assistant secretary in the Department of the Interior, testifying in support of H.R. 18573, which was the source of the exemption language that Congress ultimately enacted, explained that section 845(a)(4) "would refer to sports arms and sporting equipment." *Explosives Control Hearings* at 136. No testimony during the hearings suggested a sporting use for bullets that explode on impact. In fact, the only mention of such bullets in the Act's legislative history suggests that they were commonly considered to have a military, rather than a sporting, purpose. A model explosives act, which was drafted by the Institute of Makers of Explosives and was the subject of testimony during the hearings, contained exemption language virtually identical to what is now section 845(a)(4). *Id.* at 193. The proposed model code specifically excluded "[m]ilitary-type ammunition containing explosive bursting charges" from its definition of "small arms ammunition." *Id.* at 195.

Second, in testimony favoring exemption, expert witnesses drew a distinction between "high" explosives like lead azide, which, they acknowledged, present unique dangers

that justify strict licensing, and "low" explosives like black powder and smokeless propellants, which, they insisted, are no more dangerous than many commonly available substances such as ammonium nitrate fertilizer and which have only limited usefulness as ingredients for bombs. *Id.* at 133–34 (testimony of H. Dole), 255–64 (statement and testimony of A. Teller); 265–69 (statement and testimony of V. Goodwin); 269–76 (statement and testimony of N. Knox), and 335 (statement of C. Dickey). Neither the House bills' sponsors nor any witness who testified during the hearings advocated an exemption for the use of "high" explosives in ammunition.

Congress intended that the exemption protect only "low" explosives of a type customarily used as propellants. To broaden the exemption to cover the explosive charge of lead azide contained in the "devastator" bullet would be inconsistent with Congress' purpose to severely restrict the availability of "high" explosives. The meaning of "component" asserted by Bingham would permit the sale of any "high" explosive without an explosives license so long as there existed a conceivable use for that explosive as a part, however unusual, of small arms ammunition. Such a result would too greatly undermine the explosives licensing scheme by making all manner of "high" explosives readily available to those who professed to be handloaders.

Considering the clear intent of Congress evident in the Act's legislative history, the court holds that the section 845(a)(4) exemption for "small arms ammunition and components thereof" applies only to parts traditionally used in ammunition for sporting arms. A small charge of lead azide or other "high" explosive designed to cause a bullet to explode on impact was not considered a traditional part of such ammunition at the time Congress enacted the exemption. Therefore, section 845(a)(4) does not exempt a manufacturer and seller of bullets that contain such a charge of lead azide from the licensing requirements of the Act. In so holding, the court emphasizes that the social utility of an exploding bullet is not at issue in this case. A manu-

facturer of such bullets is subject to strict regulation not because it makes a particularly destructive kind of ammunition, but because its ammunition contains an explosive charge deemed by Congress to present dangers that make strict control of its distribution necessary.

Accordingly, the defendant United States' motion for summary judgment is GRANTED. The plaintiff's motion for summary judgment is DENIED. The clerk is DIRECTED to enter final judgment in this matter.

IT IS SO ORDERED.