439 So.2d 283 (1983)
K-MART ENTERPRISES OF FLORIDA, INC. and K-Mart Corporation, Appellants,
v.
William C. KELLER, Appellee.
No. 81-2121.
District Court of Appeal of Florida, Third District.
September 27, 1983.
Rehearing Denied November 9, 1983.
*284 Joe N. Unger, Miami, for appellants.
Headley & Headley; Highsmith & Strauss and Shelby Highsmith, Miami, for appellee.
Before SCHWARTZ, C.J., and DANIEL S. PEARSON and FERGUSON, JJ.
SCHWARTZ, Chief Judge.
The defendant in a personal injury action appeals from a judgment entered on a jury verdict against it based upon its sale of a firearm in violation of the gun control provisions of the Omnibus Crime Control and Safe Streets Act. 18 U.S.C. § 922 (1976). We affirm.
Viewed in the appropriate light most favorable to the appellee, the record shows that on September 5, 1975, a man named William Knuck bought a .30-.30 rifle from a K-Mart store in Hialeah, Florida. The clerk who sold him the firearm did not ask Knuck the questions contained in Firearms Transaction Record form 4473, provided to firearm retailers by the Bureau of Alcohol, Tobacco and Firearms, see 27 C.F.R. § 178.124, to facilitate compliance with 18 U.S.C. § 922(d). That section of the Gun Control *285 Act of 1968 forbids a dealer to sell a firearm
to any person knowing or having reasonable cause to believe that such person 
(1) is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
* * * * * *
(3) is an unlawful user of or addicted to marihuana or any depressant or stimulant drug (as defined in section 201(v) of the Federal Food, Drug, and Cosmetic Act) or narcotic drug (as defined in section 4731(a) of the Internal Revenue Code of 1954).
Accordingly, two of the questions on form 4473 asked:
Question A: Are you under indictment or information in any court for a crime punishable by prison for a term exceeding one year?
* * * * * *
Question D: Are you an unlawful user of marijuana or a depressant, stimulant, or narcotic drug?
While the K-Mart employee marked "no" to these inquiries, Knuck testified that, if asked, he would have responded truthfully that he was then in fact both the subject of a felony information in Dade County and an unlawful user of marijuana. On this basis, it clearly appears that he should not have been permitted to purchase the gun and that K-Mart acted unlawfully in selling it to him.
The events which culminated in the injury to the plaintiff in the present action occurred some six weeks later, on October 27, 1975. On that day, although he knew that his brother, Robert Knuck, was both an ex-heroin addict who was taking pills, and an alcoholic who had been drinking heavily earlier and was outright drunk at the time, William "lent" Robert a box of ammunition and the rifle he had purchased at K-Mart. After he had done so, he drove Robert to his car and then, because he thought it was a "good idea" in the light of Robert's condition, followed his brother to the home of Robert's estranged wife. At Robert's request, William knocked on the front door. Robert's wife opened it, saw Robert and slammed the door, whereupon Robert fired two shots from the .30-.30 through the window and then proceeded to his father's home a few blocks away. At that location, he took his sister and her young child hostage with the rifle. The police were called and many responded, among them the plaintiff William Keller, a Miami Springs officer. While Keller was secreted in the garage during the confrontation, Robert, described by his sister as then "drunk or stoned ... [and as] quite an alcoholic, for a long time," fired the gun two or three times through the kitchen door. One of the bullets struck Keller in the head, causing devastating personal injuries.
On this appeal, K-Mart does not seriously dispute the evidence that it was negligent per se in its sale of the firearm to William in contravention of Sec. 922(d)(1), (3). Decker v. Gibson Products Co. of Albany, Inc., 679 F.2d 212 (11th Cir.1982); Franco v. Bunyard, 261 Ark. 144, 547 S.W.2d 91 (1977); cf. Hetherton v. Sears, Roebuck and Co., 445 F. Supp. 294 (D.Del. 1978), aff'd in part, rev'd in part, 593 F.2d 526 (3d Cir.1979); see generally, de Jesus v. Seaboard Coast Line R.R. Co., 281 So.2d 198 (Fla. 1973); Florida Freight Terminals, Inc. v. Cabanas, 354 So.2d 1222 (Fla. 3d DCA 1978). Rather, it claims the right to a directed verdict in its favor on the ground that it was insulated from liability based on the "intervening" circumstances it states were so bizarre and "unforeseeable" that, as a matter of law, its conduct was not a legal cause of Keller's injuries. We cannot agree.
Both because the rules have so recently been the subject of Judge Hubbart's comprehensive opinion in Stahl v. Metropolitan Dade County, 438 So.2d 14 (Fla. 3d DCA 1983) and because they become meaningful only in terms of their application to a particular factual-legal situation as it is perceived by the courts, Mozer v. Semenza, 177 So.2d 880 (Fla. 3d DCA 1965), there is no reason here to survey or *286 expound upon the Florida law of proximate causation, foreseeability, intervening cause and the like. Three broad principles, however, are helpful in the resolution of the present controversy. First, these issues are ordinarily ones to be resolved by the trier of fact. E.g., Allen v. Babrab, Inc., 438 So.2d 356 (Fla. 1983); Vining v. Avis Rent-A-Car Systems, Inc., 354 So.2d 54 (Fla. 1977). Second, a tortfeasor need not be able to foresee  as it is necessarily impossible to foresee  the exact concatenation of events which has in fact ended in damage to another. Crislip v. Holland, 401 So.2d 1115 (Fla. 4th DCA 1981), rev. denied sub. nom. City of Fort Pierce v. Crislip, 411 So.2d 380 (Fla. 1981). It is required only that the general "type of result," Pinkerton-Hays Lumber Co. v. Pope, 127 So.2d 441, 443 (Fla. 1961), which has occurred fall within the scope of the danger or "risk" created by the negligent act in question. Gibson v. Avis Rent-A-Car System, Inc., 386 So.2d 520, 522 (Fla. 1980). See, e.g., Mozer v. Semenza, supra (unforeseeable arson not intervening cause when harm to be prevented is risk of fire); Concord Florida, Inc. v. Lewin, 341 So.2d 242 (Fla. 3d DCA 1976), cert. denied, 348 So.2d 946 (Fla. 1977) (same). Third, and perhaps most significant, these questions may be, and in this case are, answered by a statute in which the legislature has in effect "specif[ied] the type of harm for which a tortfeasor is liable." Gibson v. Avis Rent-A-Car System, Inc., supra, at 386 So.2d 520. Applying these doctrines, we conclude that the jury could properly have found the shooting of Keller was the type of harm, or "within the risk" designed to be prevented by the Gun Control Act  the misuse of a firearm by an irresponsible purchaser  so that K-Mart's non-adherence to that statute constituted a legal cause of the plaintiff's injuries.
We need not look far for the reasons Congress enacted the Gun Control Act, the purposes the statute was to serve, or  to put it in Florida causation law terms  the "type of harm" it was meant to obviate. In Huddleston v. United States, 415 U.S. 814, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974), the Supreme Court quoted extensively from the legislative history in stating that, in enacting the statute:
Congress determined that the ease with which firearms could be obtained contributed significantly to the prevalence of lawlessness and violent crime in the United States. S.Rep. No. 1097, 90th Cong., 2d Sess. 108 (1968). The principal purpose of the federal gun control legislation, therefore, was to curb crime by keeping `firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.' S.Rep. No. 1501, 90th Cong., 2d Sess. 22 (1968).
Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, and the Gun Control Act of 1968, are thus aimed at restricting public access to firearms. Commerce in firearms is channeled through federally licensed [dealers] in an attempt to halt mail-order and interstate consumer traffic in these weapons. The principal agent of federal enforcement is the dealer. He is licensed, §§ 922(a)(1) and 923(a); he is required to keep records of `sale ... or other disposition,' § 923(g); and he is subject to a criminal penalty for disposing of a weapon contrary to the provisions of the Act, § 924.
... . Information drawn from records kept by dealers was a prime guarantee of the Act's effectiveness in keeping `these lethal weapons out of the hands of criminals, drug addicts, mentally disordered persons, juveniles, and other persons whose possession of them is too high a price in danger to us all to allow.' 114 Cong.Rec. 13219 (1968)... .
From this outline of the Act, it is apparent that the focus of the federal scheme is the federally licensed firearms dealer, at least insofar as the Act directly controls access to weapons by users. [e.s.]
415 U.S. at 824-825, 94 S.Ct. at 1268-1269.
From these statements of legislative intent, it seems clear that the "risk of harm" Congress meant to prevent was just the "type" of conduct which occurred in this case. The *287 injury took place as a direct result of K-Mart's selling a "lethal weapon" to one whom Congress has determined to be incompetent to buy it just because of the dangers to "us all," including William Keller, by the likelihood of its being misused.
Since the irresponsibility and unpredictability of the recipient was the very reason that Congress forbade such a transfer of the firearm, it can make no difference that the danger was actually realized, as it almost invariably must be, in what would in other contexts be deemed an unanticipatable manner. As was said in Holley v. Mt. Zion Terrace Apartments, Inc., 382 So.2d 98 (Fla. 3d DCA 1980), quoting from comment b to Restatement (Second) of Torts, § 449 (1965):
The happening of the very event the likelihood of which makes the actor's conduct negligent and so subjects the actor to liability cannot relieve him from liability. The duty to refrain from the act committed or to do the act omitted is imposed to protect the other from this very danger. To deny recovery because the other's exposure to the very risk from which it was the purpose of the duty to protect him resulted in harm to him, would be to deprive the other of all protection and to make the duty a nullity.
382 So.2d at 101. One who gives matches to a pyromaniac can hardly claim that it could not be exactly foreseen what or whom he might harm or in what strange manner or how long it might take him to light the fire. See American Mutual Liability Ins. Co. v. Buckley & Co., 117 F.2d 845 (3d Cir.1941); Bridges v. Dahl, 108 F.2d 228 (6th Cir.1939); Dickens v. Barnham, 69 Colo. 349, 194 P. 356 (1921); Binford v. Johnston, 82 Ind. 426, 42 Am.Rep. 508 (1882); McEldon v. Drew, 138 Iowa 390, 116 N.W. 147 (1908); Carter v. Towne, 98 Mass. 567, 96 Am.Dec. 682 (1868); Cote v. Sears, Roebuck & Co., 86 N.H. 238, 166 A. 279 (1933); Henningsen v. Markowitz, 132 Misc. 547, 230 N.Y.S. 313 (N.Y. Sup. Ct. 1928); Kuhns v. Brugger, 390 Pa. 331, 135 A.2d 395 (1957); Mendola v. Sambol, 166 Pa.Super. 351, 71 A.2d 827 (1950); Annot., Liability of seller of firearm, explosive, or highly inflammable substance to child, 20 A.L.R.2d 119 (1951).
In accordance with these principles, numerous cases have held that the criminal misuse of a firearm does not insulate the seller from liability arising out of a violation of similar provisions of the Gun Control Act. Decker v. Gibson Products Co. of Albany, Inc., supra; Franco v. Bunyard, supra; J.M. Fields Co. v. Smuckler, 385 So.2d 124 (Fla. 3d DCA 1980) (per curiam); see also, Hetherton v. Sears, Roebuck & Co., supra; Sosa v. Coleman, 646 F.2d 991 (5th Cir.1981); contra, Robinson v. Howard Brothers of Jackson, Inc., 372 So.2d 1074 (Miss. 1979). We follow these decisions in this case.
K-Mart argues that even if it could be held liable if its illegal vendee, William, had himself fired the shot which injured Keller, his entrustment of the weapon to Robert legally intervened to preclude recovery. Again, we disagree. Congress did not want William to have the gun because he was deemed incapable  as a result, inter alia, of his marijuana use  of handling it. Common experience teaches that one of the bases and manifestations of such a lack of judgment is the danger of letting someone else have possession of the gun who is similarly incapable. That is just what happened here. William deliberately gave it to Robert although he knew of his brother's drunken state and mental condition. That William would commit such an act was, to revert to the prior analysis, directly within the "scope of the risk" which would not have arisen if K-Mart had obeyed the statutory directive not to sell him the rifle in the first place.
Turning the coin over, Robert was, if anything, markedly less competent than William to be entrusted with the gun. An "intervening" act which does not change the nature of the risk created by the tortfeasor  as when one child gives a dangerous object to another  does not break the causal chain. See Collins v. Arkansas Cement Co., 453 F.2d 512 (8th Cir.1972); *288 Spires v. Goldberg, 26 Ga. App. 530, 106 S.E. 585 (1921); Pudlo v. Dubiel, 273 Mass. 172, 173 N.E. 536 (1930); Poe v. Canton-Mansfield Dry Goods Co., 36 Ohio App. 395, 173 N.E. 318 (1929); Wassel v. Ludwig, 92 Pa. Super. 341 (1928); Annot., Liability of person permitting child to have gun or leaving gun accessible to child, for injury inflicted by the latter, 68 A.L.R.2d 782 (1959). Thus, it would be immaterial if William had given the gun to Robert, who fired it in an armed robbery in which they were both involved. A fortiori, it cannot avail the defendant that William gave it to him under circumstances which actually increased the likelihood that the harm the statute was meant to preclude would, as it did, come to pass.
We have carefully examined the appellant's other contentions and likewise find no error.
Affirmed.