PRISCILLA R. OWEN, Circuit Judge,
concurring:
I write separately to provide additional context and explication.
I
The Government contends that the laws and regulations under consideration are “presumptively lawful” because they are “longstanding prohibitions” that impose “conditions and qualifications on the commercial sale of arms,” within the contemplation of the Supreme Court’s decision in District of Columbia v. Heller.

[1]

 This argument is not well-taken.
The Government asserts that between 1909 and 1939, at least fifteen states had enacted laws restricting the acquisition, or carrying of one or more types of firearms to state residents.[2] The Government contends that evidence of “founding-era thinking” is not required. This court said in National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives (NRA), that “a regulation can be deemed ‘longstanding1 even if it cannot boast a precise founding-era analogue.”[3] In that case, our court nevertheless extensively considered founding-era “[ajttitudes” regarding gun laws and regulations.[4] This court observed in NRA that “[sjcholars have proposed that at the time of the founding,” there was an implication that only ‘“the virtuous citizen’” had the right to possess and use arms and that criminals, children and the mentally ill were “‘deemed incapable of virtue,’”[5] which was relevant to whether the federal *194 law at issue in that case, prohibiting the sale of a handgun to someone under the age of 21, was constitutional.
More importantly, in Heller, the. Supreme Court exhaustively canvassed laws extant at the time of, and predating, the Bill of Rights in determining,the meaning of the Second Amendment,[6] though it also considered pre-Civil War commentators and case law,[7] post-Civil War legislation,[8] post-Civil War commentators,[9] and a limited analysis of, some of the restrictions recognized in an . era spanning from “Blackstone through the 19th Century.”[10] The Government asserts that in Heller, the Supreme Court described “prohibitions on the possession of firearms by felons” as “longstanding prohibitions” that are “pre-gumptively lawful,”[11]. though the District of Columbia Circuit subsequently concluded that “states did not start to enact [prohibitions on the possession of firearms by felons to which the Supreme Court referred in Heller] until the early 20th century.”[12]. But, as this court recognized in NRA, there are indications that in the founding era, it was generally thought that felons, and the mentally ill should and could be prohibited from bearing arms.[13]

In the present case, the Govérnment has offered no evidence that an in-state sales requirement has a founding-era analogue or was historically understood to be within the ambit of the permissible regulation of commercial sales of firearms at the time the Bill of Rights was ratified. However, even if it is appropriate to consider only 20th century laws, an in-state sales requirement was .not a “historical tradition” [14] or commonly found in the laws of the United States in that era.
The Government has identified sixteen statutes in fifteen states dating from the early 20th century regarding the licensing or permitting of firearms or the carrying of concealed firearms.[15] But none of these *195 laws prohibited a citizen of a state from purchasing a firearm, or a specific type of firearm, in another state. The only state law cited by the Government that addresses the purchase of a firearm in another state is a 1918 Montana statute that prohibits the purchase, borrowing, or other acquisition of a firearm outside of that state without first obtaining a permit in the county of the purchaser’s or' acquirer’s residence.[16] Even that state law permitted a resident to purchase a firearm, including a handgun, in another state.
We acknowledged in NRA that courts “may rely on a wide array of interpretive materials to conduct a historical analysis,”[17] but in the present case, the Government has offered no evidence from in-térpretive materials that an in-state sales requirement was considered lawful under the Second Amendment as that amendment has historically been understood. In the absence of- such authority, the in-state sales requirement is not among the “longstanding ... laws imposing conditions and-qualifications on the commercial sale’ of arms”[18] that presumptively do not violate the Second Amendment.
II
Whether the in-state sales requirement has a rational basis is not the correct standard by which to measure its constitutionality. The Supreme Court made clear in Heller that rational basis scrutiny is inappropriate when evaluating the constitutionality of laws that impose conditions or qualifications on the right to keep and bear arms.[19] The Court reasoned that “rational-basis scrutiny is a mode of analysis we have used when evaluating laws under constitutional commands that are themselves prohibitions on irrational laws.”[20] The Court concluded that “[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on ’irrational laws, and would have no effect.”[21] The Heller decision recognized that the regulation at issue was as a “handgun ban [that] amounts to a prohibition of an entire class - of ‘arms,’ ”[22] and that the law “fail[ed] constitutional muster” under both the strict and .intermediate, standards of scrutiny.[23]

The Government contends that intermediate scrutiny, rather than strict scrutiny, applies in analyzing the in-state sales requirement because, unlike the regulation at issue in Heller, it is not a “ban” on the sale of handguns.[24] In NRA, we “rejected] the contention that every regulation impinging upon the Second Amendment right must trigger strict scrutiny” and held that the “properly tuned level of scrutiny ... is *196 [that which is] proportionate to the severity of the burden.”[25] We also suggested that “a regulation that does not encroach on the core of the Second Amendment” may be subject only to intermediate scrutiny.[26] Conceivably, a restriction on the commercial sale of a handgun could impinge on the right to possess and bear arms to such an extent that, though not an- absolute “ban” on the possession or use of a handgun, strict scrutiny would be applicable. The Government is correct that the instate sales requirement is not a total prohibition on handgun possession and use. The in-state sales requirement does not prohibit residents of the District of Columbia from purchasing a handgun in the District or a resident of a state from buying a handgun in that state.
In assessing the impact of the federal restrictions upon the Hansons and Manee, it must be recognized that it is the District’s restrictions that have led the lone FFL in the District to sell only handguns that are transferred from an FFL in one of the states. The fact that no handguns are available for direct purchase in the District is not a result of the in-state sales requirement or any other federal law or regulation. Nor do the federal laws set or require the imposition of a transfer fee by an FFL.
The in-state sales requirement does not prevent a resident of a state or the District of Columbia from using a handgun “in defense of hearth and home.”[27] Once lawfully acquired, a handgun may be used and possessed as a defensive weapon where the owner of the handgun resides.
Nevertheless, because the Supreme Court held that the law at issue in Heller was unconstitutional under both strict ánd intermediate scrutiny, it is prudent first to apply strict scrutiny to the in-state sales requirement. Since the panel concludes that the in-state sales requirement satisfies that heightened standard, it is unnecessary to resolve whether strict scrutiny is required.

Ill
The district court’s reasoning is thoughtful, and it is correct in many respects. The district court correctly recognized that “[t]he principal purpose in enacting the 1968 Gun Control Act was to curb crime by keeping ‘firearms out of the hands of those not legally entitled to possess them,’ ”[28] and that “Congress intended to accomplish this” by precluding the crossing of a state line to purchase a handgun.[29] The district court recognized that in 1968, “an instant electronic background check system did not exist,” but that the Gun Control Act was subsequently amended by the Brady Act.[30] The district court found that as a result, “before an FFL may sell or deliver a firearm to a non-FFL, he must complete a criminal background check through the National Instant Criminal Background Check System (‘NICS’) to ensure the purchaser is legally entitled to obtain and possess the firearm”[31] and that *197 “States may also create a Point of Contact (‘POC’), who acts as a liaison to NICS, to run the background check and receive notice of anticipated firearms purchases by its citizens.”[32]

The district court concluded that this system “ensures potential purchasers can legally acquire and possess a firearm under state and federal law, and those states that desire to receive notice of firearms purchased by its citizens simply establish a POC,”[33] and that these checks “identify both federal and state disabilities” in would-be purchasers.[34] This conclusion is not entirely supported by the record.
The Government presented evidence that the federal background check system does not reflect whether a person seeking to purchase a handgun has satisfied state requirements that may include training and special permits and does not reflect whether a particular type of firearm is legal in a particular state. The Government also noted that states may require additional procedures and a mandatory waiting period before a transaction may occur and that this information regarding a particular individual is not available in the databases.
But not all of the Government’s arguments are well-taken. In contending that in-state background checks are superior to those conducted by FFLs in other states because the federal background check database may not include all information available to a state, the Government asserts that “states may face logistical and budgetary constraints in submitting information, and they may have privacy laws that prevent sharing of certain records,” such as mental health records, and alcohol and drug use information. The Government has not explained how or why a state would be able to provide information such as mental health information for purposes of a transfer of a handgun by an in-state FFL but could not provide that information to an out-of-state FFL. Nevertheless, for the reasons set forth in the panel’s majority opinion, the in-state sales requirement withstands strict scrutiny.
IV
The Government adduced evidence that addresses, in part, the disparate treatment of handguns and long guns under federal laws. When Congress enacted the in-state sales requirement in 1968, statistics reflected that “hqndguns were used in 70 percent of murders committed with firearms,” [35] and that handguns were used in 78 percent of the firearm-related homicides of police officers killed in the line of duty.[36] The Government also presented evidence that, according to FBI statistics, handguns were the type of weapon involved in at least 70 percent of firearm homicides from 2009 to 2013,[37] and that handguns were used in 73 percent of firearms-related felony homicides of law enforcement officials killed in the line of duty *198 from 2004 -to 2013.[38] This reflects that the type of firearm predominantly used in these crimes was a handgun, not a shotgun or rifle, and that the federal government has a compelling interest in addressing the type of weapon most frequently used to commit crimes and in seeking to . ensure that state laws regulating the possession and use. of that type of weapon are effective.

. 554 U.S. 570, 626-27, 627 n.26, 128 S.Ct. 2783 (2008).

. See infra note 15.

. 700 F.3d 185, 196 (5th Cir. 2012).

. Id. at 200-202.

. Id. at 201 (quoting Don B. Kates & Clayton E. Cramer, Second Amendment Limitations and Criminological Considerations, 60 Hastings L.J. 1339, 1359-60 (2009)).

. Dist. of Columbia v. Heller, 554 U.S. 570, 580-605, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

. Id. at 605-614, 128 S.Ct. 2783.

. Id. at. 614-616, 128 S.Ct. 2783.

. Id. at 616-619, 128 S.Ct. 2783.

. Id. at 626-628, 128 S.Ct. 2783; see also id. at 626, 128 S.Ct. 2783 (citing The American Students’ Blackstone 84 n. 11 (G. Chase ed. 1884)).

. Id. at 626-27, 627 n.26, 128 S.Ct. 2783.

. Heller v. Dist. of Columbia, 670 F.3d 1244, 1253 (D.C. Cir. 2011).

. Nat’l Rifle Assoc. of Amer., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 700 F.3d 185, 200-202 (5th Cir. 2012).

. Heller, 554 U.S. at 627, 128 S.Ct. 2783.

. Act of Apr. 6, 1936, No. 82, §§ 1, 5, 7, 1936 Ala. Laws 51, 51-52, amended by Act of Mar. 2, 1937, No. 190, § 1, 1937 Ala. Laws 223, 223 (Alabama in 1937); Act of March 19, 1923 §§ 1, 3, 1923 Ark. Acts 379, 379-80 (Arkansas in 1923); Act of Aug. 12, 1910, No. 432, 1910 Ga. Laws 134 (Georgia in 1910); Act of July 11, 1919, § 4, 1919 III. Laws 431, 432 (Illinois in 1919); Act of Feb. 21, 1935, ch. 63, §§ 1,. 3, 5, 1935 Ind. Laws 159, 159-61 (Indiana in 1935); Act of Feb. 25, 1939, ch. 14, 1939 Me. Acts 53 (Maine in 1939); Act of May 29, 1922, ch. 485, § 9, 1922 Mass. Acts 560, 563 (Massachusetts in 1922); Act of June 2, 1927, ch. 372, §§ 2, 6, 1927 Mich. Acts 887, 887-89 (Michigan in 1927); Act of April 7, 1921, § 2, 1921 Mo. Laws 692 (Missouri in 1921); Act of Feb. 20, 1918, ch. 2, §§ 1-3, 8, 1918 Mont. Laws 6, 6-9 (Montana in 1918); Act of March 3, 1919, ch. 74, § 5, 1919 Mont. Acts 147, 148 (Montana in 1919); Act of March 11, 1924,. ch. 137, §§ 1-2, 1924 N.J. Acts 305, 305-06 (New Jersey in 1924); Act of May 21, 1913, ch. 608, § 1, 1913 N.Y. Laws 1627, 1628-29 (New York in 1913); Act of March 10, 1919, ch, 197, §§ 1-2, 1919 N.C. Laws 397, 397-98 (North Carolina in 1919); Act of Feb. 26, 1913, ch. 256, § 1, 1913 Or. Laws 497 (Oregon in 1913); Act of May 2, *195 1910, ch. 591, § 1, 1910 R.I. Acts 156, 156-57 (Rhode Island in 1910); Act of-Feb. 16, 1909, ch, 51, 1909 W. Va, Acts 394, 395-96 (West Virginia in 1909).

. See Act of Feb. 20, 1918, ch. 2, § 3, 1918 Mont. Laws at 6-9.

. NRA, 700 F.3d at 194.

. Heller, 554 U.S. at 626-27, 128 S.Ct. 2783.

. Id. at 628 n.27, 128 S.Ct. 2783.

. Id.

. ids="3677081" index="147" url="https://cite.case.law/us/554/570/#p592">id.

. Id. .at 628, 128 S.Ct. 2783.

. Id. at 628-29, 128 S.Ct. 2783 ("Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home ‘the most preferred firearm in the nation to "keep” and use for protection of one’s home and family’ ... would, fail constitutional muster.” (quoting Parker v. Dist. of Columbia, 478 F.3d 370, 400 (D.C. Cir. 2007))).

. Id. at 628, 128 S.Ct. 2783.

. Nat’l Rifle Assoc. of Amer., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 700 F.3d 185, 198 (5th Cir. 2012).

. Id. at 195.

. Heller, 554 U.S. at 635, 128 S.Ct. 2783.

. Mance v. Holder, 74 F.Supp.3d 795, 809 (N.D. Tex. 2015) (quoting Huddleston v. United States, 415 U.S. 814, 824, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974)).

. Id.

. Id. (citing Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993)).

. Id. (citing 18 U.S.C. § 922(t)).

. ids="3677081" index="167" url="https://cite.case.law/us/554/570/#p592">id.

. ids="3677081" index="168" url="https://cite.case.law/us/554/570/#p592">id.

. Id. at 810 (citing 18 U.S.C. § 922(t)).

. S. Rep. No. 89-1866 (1966), at 5.

. See Fed. Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. On the Judiciary, 90th Cong. 899 (1968).

, See Crim. Justice Info. Servs, Div„ FBI, 2013 Law Enforcement Officers Killed and Assaulted, tbl. 27, https://ucr.fbi.gov/leoka/2013/ tables/table_27_leos_fk_type_of_weapon_ 2004-2013.xls [https://perma.ee/8V2C-FPZ7] (last visited Nov. 29, 2017).

. See Crim. Justice Info. Servs. Div., FBI, Crime in the United States 2013: Expanded Homicide Data, tbl. 8, https://ucr.fbi.gov/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/ offenses-known-to-law-enforcemen1/ expanded-homioide/expanded_homicide_ data_table_8_murder_victims_by_weapon_ 2009-2013 .xls [https://perma.ee/S7MA-VH8H] (last visited Nov. 29, 2017).