# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-523

**STATE OF LOUISIANA**

**VERSUS**

**LAURIE ELKINS RICHARD**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 2020-CR-223066-A
HONORABLE KERRY L. SPRUILL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## GARY J. ORTEGO
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Van H. Kyzar, Charles G. Fitzgerald, and Gary J. Ortego, Judges.

**CONVICTION REVERSED; JUDGMENT OF ACQUITTAL ENTERED; SENTENCE VACATED.**

KYZAR, J., concurs and assigns reasons.

**Hon. Charles A. Riddle, III**
**District Attorney**
**Jonathan T. Gaspard**
**Assistant District Attorney**
**Twelfth Judicial District**
**P. O. Box 546**
**Marksville, LA 71351**
**(318) 240-7329**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**Paula C. Marx**
**Louisiana Appellate Project**
**P. O. Box 82389**
**Lafayette, LA 70598-2389**
**(337) 991-9757**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Laurie Elkins Richard**

**ORTEGO, Judge.**

In this criminal matter, Defendant appeals her conviction, and sentence, for failure to seek assistance, death related, in violation of La.R.S. 14:502.

## PROCEDURAL HISTORY

On September17, 2020, an Avoyelles Parish Grand Jury indicted Defendant, Laurie Elkins Richard, for failure to seek assistance, in violation of La.R.S. 14:502. On February 7, 2023, a jury trial commenced, and after presentation of evidence, a six-person jury unanimously found Defendant guilty as charged. On March 21, 2023, the trial court sentenced Defendant to four years imprisonment at hard labor, in the custody of the Department of Corrections, with credit for time served from the date of her arrest. Now, Defendant appeals, asserting three assignments of error.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR NUMBER ONE

In her first assignment of error, Defendant asserts that the evidence produced at trial was insufficient to support a guilty verdict of failure to seek assistance, death related. Before addressing the merits of Defendant's arguments, we will provide the applicable law.

*Standard of Review*

The analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct.

2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

It is the factfinder's role to weigh the respective credibility of the witnesses, and the reviewing court will not second-guess the credibility determinations of the factfinder beyond the sufficiency evaluations under the *Jackson* standard of review. *State v. Richardson*, 425 So.2d 1228 (La.1983).

In reviewing Defendant's claim, we must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781(1979); *State v. Rosiere*, 488 So.2d 965 (La.1986).

Defendant was convicted of failure to seek assistance, death related, in violation of Louisiana Revised Statutes 14:502 (A)(1), which in pertinent part, states (emphasis added):

Any person at the scene of an emergency who ***knows*** that another person has suffered serious bodily injury shall, to the extent that the person can do so without danger or peril to self or others, give reasonable assistance to the injured person. Reasonable assistance includes immediately seeking or reporting the need for medical assistance from an appropriate authority.

2

Louisiana Revised Statutes 14:2(C) defines serious bodily injury as injury that "involves unconsciousness; extreme physical pain; protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death."

## SUFFICIENCY OF EVIDENCE

As Defendant raises the sufficiency of the evidence as an assignment of error, we will review and provide a summary of the evidence adduced at trial.

*Trial Evidence*

The first witness to testify at trial was Officer Derek Ward, a patrolman for the Tunica Biloxi Tribal Police. On October 30, 2019, Officer Ward received a call from the Avoyelles Emergency Center, requesting medical assistance for an unresponsive person, possibly under the influence of heroin, at cabin 216. Whenever Officer Ward arrived, he saw Defendant on the passenger side of a two-door car holding the arm of another female, later identified as Samantha Bernard. According to Officer Ward's testimony, Ms. Bernard was face down "in a kneeling position[]" on the passenger seat. Ms. Bernard was unresponsive and did not appear to be breathing, so Officer Ward checked for a pulse. Due to his inability to find a pulse, Officer Ward removed Ms. Bernard from the vehicle and engaged in life-saving measures by completing chest compressions and administering Narcan, a medication used to reverse the effects of an opioid overdose. Officer Ward requested the assistance of Acadian Ambulance; however, Ms. Bernard was pronounced dead shortly after arriving at the emergency room.

After leaving the emergency room, Officer Ward returned to the police department, wherein he and Detective Smith interviewed Defendant and Ms. Amy

Adams. Officer Ward then recited from his investigation report:

> . . . Ms. Richard was interviewed at the Tunica Biloxi Tribal Police headquarters by Detective Scott Smith and [myself]. During the interview Ms. Richard stated that she woke up around eleven or twelve o'clock that day previously at Cabin 216 and noticed that Samantha was not there. She added that after failed attempts to contact Samantha she called Amy Adams to search for Samantha's car. Ms. Richard stated that Ms. Adams located Samantha in the parking lot of Harvest Foods. Ms. Richard continued with her statement by saying that Ms. Adams left Harvest Food and picked her, being Laurie Richard, picked her up at [C]abin 216.

When questioned regarding the registered owner of the vehicle operated by Ms. Bernard, Officer Ward stated he could not recall, and he did not have that information in his report. Thereafter, Officer Ward continued to recite from his investigation report, stating:

> . . . Ms. Amy left Harvest Foods and picked Laurie Richard up at Cabin 216 and the two of them together in Amy's car returned to Harvest Foods. Upon arrival at Harvest Foods, Ms. Richard stated that [she] noticed Samantha in a familiar state due to previous incidents. Ms. Richard described the state as being high on heroine [sic]; Ms. Richard stated that due to previous incidents she drove Samantha back to Cabin 216 to allow her "to sleep it off". Ms. Richard added that she left Samantha in the car and would check on her frequently. Shortly before calling 911 Ms. Richard stated that she went out to check on Samantha and noticed that she was not breathing, prompting the 911 call.

Officer Ward's review of the surveillance footage obtained in his investigation determined that the vehicle, occupied by Ms. Bernard and Defendant, returned to the cabin at "13:47:09" or "1:47 pm." No other details were documented until Defendant called 911 at 8:46 pm, requesting medical assistance for Ms. Bernard, almost seven hours later.

The State presented surveillance footage of Harvest Foods parking lot. While viewing the footage, Officer Ward identified the Mitsubishi vehicle occupied by Ms. Bernard and identified the Chrysler vehicle driven by Ms. Adams. Thereafter,

4

Officer Ward noted for the court when Ms. Adams and Defendant arrived in the parking lot to move Ms. Bernard.

Following the footage of Harvest Foods, the State presented the bodycam footage of Officer Jeansonne, one of the officers who arrived on scene at the cabin. Officer Ward stated the Chrysler and Mitsubishi vehicles shown on the bodycam footage were the same vehicles seen at the Harvest Foods parking lot. Officer Ward also identified Ms. Bernard, the individual lying on the ground, Defendant, the individual wearing the LSU shirt, and Ms. Adams, the individual wearing black.

After the presentation of the video evidence, Officer Ward discussed Defendant's reasoning for waiting seven hours to call for medical assistance. Officer Ward explained, Defendant wanted Ms. Bernard "to sleep it off[.]" Officer Ward stated Defendant "frequently" checked on Ms. Bernard; however, Defendant never defined her version of frequently. According to Officer Ward, he obtained an arrest warrant based on Defendant's interview, the video footage, and the time frame of the incident.

The State's next witness was Amy Dauzat Adams, Ms. Bernard's long-time best friend. Ms. Adams explained Ms. Bernard introduced her to Defendant, and Ms. Bernard and Defendant were partners. Ms. Adams stated although she had knowledge of Ms. Bernard's drug usage, she never witnessed Ms. Bernard engage in any type of drug activity.

Ms. Adams explained she knew Ms. Bernard was in town because the cabin Ms. Bernard and Defendant stayed in was in her name. Ms. Adams received free rooms every month, so she would allow Ms. Bernard to stay in the rooms while Ms. Bernard was in town visiting family, and Ms. Bernard typically stayed two nights during the week.

On the morning of the incident, Ms. Bernard stopped by Ms. Adams's job while on her way to purchase a beverage at the convenience store. At the time, Ms. Adams was working at the Casino Golf Cabins, a hotel near the Paragon Casino. Ms. Adams testified Ms. Bernard stayed for about five minutes and during their conversation, Ms. Bernard told Ms. Adams she intended to stay another night in the cabin.

Ms. Adams testified she got off around noon on the day of the incident and called Ms. Bernard, but Ms. Bernard did not answer. Ms. Adams stated she drove by the casino area to find Ms. Bernard; however, she did not see Ms. Bernard's car. Ms. Adams then called Defendant, but Defendant did not answer. In the meantime, Ms. Adams went to Wal-Mart to pick up a few items, and while on her way home, she received a call from Defendant. Ms. Adams questioned Defendant regarding Ms. Bernard's whereabouts, and Defendant stated she did not know of Ms. Bernard's location. Ms. Adams testified that while on her way home and on the phone with Defendant, she approached the red light by Harvest Foods, turned her head, and saw Defendant's car in the parking lot. Ms. Adams then provided the following testimony:

> A. And when I just so happened to look by Harvest Foods and I'm like Laurie your car is at Harvest Foods. So she said go see. I went over there by Harvest Foods, pulled on the side of the car. And I asked Laurie, I said Laurie that can't be her, did she dye her hair purple. She said yes she dyed her hair purple. So I drove by the car, on the side of the car. And I mean you could tell she was on some type of drug. Well I don't ...
>
> Q. Where was she at that time.
>
> A. Sitting in [sic] the driver's side of the car.
>
> Q. Was she awake?

A.    I mean ... to me ... put it like this she was sitting up, she was moaning and everything, because I hit on the glass and you could tell she was moaning. I mean she was alive.

Q.    I understand ...

A.    I mean she was moaning and stuff, you know what I'm saying. Because I was hollering her name and stuff.

Q.    You were hollering her name?

A.    And hitting on the glass, yes.

Q.    O.K.

A.    To tell her to wake up?

Q.    Did she respond with any kind of verbal, oral communication?

A.    No she was just like moaning like, [ ], [ ]. And I'm thinking trying to wake up [sic], I was thinking.

Q.    Were her eyes closed, open or what?

A.    I mean they was [sic] like halfway you know. I don't know how to explain it. I mean like literally you know what I mean, not all the way open.

Q.    Like she was on drugs?

A.    Oh yeah, I knew that yeah.

. . . .

Q.    So you went to the casino cabins, 216?

A.    Ye[s].

Q.    Picked [Defendant] up?

A.    Yes.

Q.    In your vehicle?

A.    Yes.

. . . .

7

Q.     All right. Then what was next?

A.     I mean was just doing the same thing, you know Laurie knew what she was doing, so we figured and put her back in the cabin she was going to wake up. We moved her, I went on the passenger side...

Q.     I want you to tell me exactly how ya'll [sic] moved her.

A.     O.K.

Q.     From the driver's side to the ...

A.     She was standing on the driver's side when she was pressing her chest already; I was on the passenger watching what she was doing. When she said we need ... she decided let's move her to get her back for her to wake up.

Q.     O.K.

A.     I was already on the passenger side. She helped me, I grabbed her leg. I mean she ... I mean she was moaning and groaning like she wasn't dead weight, she could still help u[s] move her. You know what I mean because she was already a heavy person at that time. I mean we moved her to the other side.

Q.     So you grabbed her legs?

A.     Yeah grabbed one of her legs, you hear what I'm saying, and we put her on the passenger side.

Q.     Was she sitting when ya'll [sic] finished?

A.     Oh yes.

Q.     So she was sitting, was she slumped over or...

A.     No.

Q.     So she was sitting upright?

A.     Yeah.

       . . . .

Q.     All right. So her legs were in the passenger side on the floor?

A.     Um hum.

8

Q.    And she was leaned back against the seat?

A.    Yes.

Q.    Did she communicate with you?

A.    No.

Q.    Were you concerned?

A.    I don't even know ... I can't say because I've never been around her like that when she doing this.

Q.    So you've never seen her like that?

A.    No.

Q.    Did you ever think that you ought to bring [sic] her to the hospital?

A.    At some points I do. But I mean she was always waking up from everything when she done this. I just thought this too she's going to wake up. I mean she been doing this for so many years I mean, It's like she's ...

Q.    You knew she was doing drugs?

A.    Since I knew her seventeen years ago.

Q.    O.K. Who drove Laurie's car with Samantha in it back to the cabin?

A.    Laurie.

Q.    You say [sic] her drive off?

A.    Yes.

Q.    Where did you go from there?

A.    Back to my house on Preston Street.

Afterwards, Ms. Adams testified she periodically called and texted Defendant to check on Ms. Bernard. According to her, Defendant stated she continuously checked on Ms. Bernard and even placed a rag on Ms. Bernard's face. Ms. Adams stated that around nine o'clock, Defendant notified her that Ms. Bernard "[did not]

9

look good," prompting Ms. Adams to drive over to the cabin. Upon arrival at the cabin, Ms. Adams stated, "Laurie was on the passenger side" and "it just didn't look right," so she told Defendant to call 911; however, she hurried up and grabbed the phone from Defendant and started talking to the 911 operator. Ms. Adams testified she stayed at the cabin until the police and ambulance arrived and eventually went to the police station to give a statement.

On cross-examination, Ms. Adams stated Ms. Bernard told her she engaged in drug activity and that Ms. Bernard was recently "doing heavier stuff." According to Ms. Adams, Ms. Bernard engaged in drug activity "a lot" and that "it was a routine" for Ms. Bernard, as her life was consumed by drugs.

Dr. James Lynn Bordelon, an expert in the field of general medicine and investigation of deaths, testified that at the time of Ms. Bernard's death one of the assistant coroners managed the investigation. Dr. Bordelon testified Ms. Bernard's body was transferred for an autopsy at the Louisiana Forensic Center due to "the unusual circumstances surrounding her death." Dr. Bordelon stated Ms. Bernard's autopsy revealed she had no significant physical injuries attributable to her death; however, her toxicology report revealed she tested positive for numerous pharmacological agents that lead to or contributed to her death. According to Dr. Bordelon, Ms. Bernard ingested several different compounds that led to the depression or suppression of her breathing, which resulted in her cardiac arrest. In other words, Ms. Bernard died of a drug overdose.

Dr. Bordelon then discussed Narcan and its effects. Dr. Bordelon stated that Narcan immediately reverses the side effects of narcotics in the body. In the field, Narcan is administered through the nasal cavity, and at the hospitals, Narcan is administered through an IV for a more rapid response. Dr. Bordelon stated that

Narcan saves millions of lives and that the time of the administration is a critical element as to the overall effect of Narcan on the body. Having narcotics in the body without the administration of Narcan can eventually lead to either cardiac arrest or a "vegetable" state due to the lack of blood supply to the brain. According to Dr. Bordelon, an earlier administration of Narcan would have saved Ms. Bernard's life.

On cross-examination, Dr. Bordelon stated that someone may not experience serious side effects of heroin that would make the administration of Narcan necessary. However, in Ms. Bernard's case, "she had other narcotics that accelerated the effects of the heroin[e]" in her system. According to Dr. Bordelon, heroin is an "opioid medication" that "slows down everything in the body," creating a "neurological high." Heroin slows down one's breathing, heart rate, and gastrointestinal system and causes "pinpoint pupils." Dr. Bordelon stated a chronic user of heroin normally passes out or sleeps after ingesting the drug, and depending on the metabolism of the individual, a heroin user can sleep for a long period of time. For clarification purposes, on re-direct, Dr. Bordelon stated that the medical term "unconscious" and the street term "passing out" were "synonymous with one another."

Ms. Kiara Ford, the 911 dispatcher who received the call for assistance, testified she conducted an incident report after receiving the call, which the State presented as Exhibit 3. According to the report, the call for assistance was initiated at "20:41" or "8:41 pm." The State then introduced the 911 call into evidence and played it for the jury. In Ms. Ford's opinion, more than one person spoke on the phone throughout the call. Ms. Ford explained she contacted Tribal Police and Acadian Ambulance due to the nature of the call she received.

Dr. Christopher Tape, an expert in forensic pathology, was called to testify. Before Dr. Tape testified as to Ms. Bernard's autopsy findings, the State introduced Dr. Tape's autopsy report into evidence, which included the cause and manner of death, as well as an anatomic summary, diagram, and toxicology screen. Dr. Tape testified at around noon on October 31, 2019, he performed Ms. Bernard's autopsy. Ms. Bernard's toxicology tested positive for numerous specimens, including a heroine metabolite. Dr. Tape testified heroin disappears relatively quickly in the body and generally goes undetected ten to fifteen minutes after ingestion. Ms. Bernard's toxicology also revealed she had morphine, "a heroin metabolite[;]" methamphetamine, "a type of speed[]" or "an upper[;]" nortriptyline, "an anti-depressant[;]" oxycodone, an "opioid, pain pill[;]" oxymorphone, "a metabolite of oxycodone[;]" hydrocodone, an "opioid pain pill[;]" and dihydrocodone, "a metabolite of hydrocodone." Dr. Tape ultimately concluded that Ms. Bernard's cause of death was "poly-drug toxicity with contributions of hypertensive atherosclerotic cardiovascular disease and obesity [,]" or plainly stated, an accidental overdose.

After discussing Ms. Bernard's toxicology results, Dr. Tape explained the history of opioid use as well as the purpose and effect of Narcan. Dr. Tape testified "opioids bind to the natural receptor[s]" in the body and "blocks pain signals[,]" so that the "brain doesn't perceive [the] pain." Dr. Tape explained that Narcan binds to the receptors as well but "doesn't turn off the pain signal." So, consequently, when Narcan and opioids are in the body, they compete for the binding site. However, opioids "usually last longer than the Narcan" and "bind stronger[,]" so, a person under the influence of opioids must be frequently administered Narcan to

12

reverse the effects of the opioids. Then Dr. Tape testified as to the effectiveness of Narcan in Ms. Bernard's situation.

On cross-examination, Dr. Bordelon testified that it was not unusual for heroin users to sleep or have "the nod[.]" Dr. Bordelon noted, however, that when a heroin user is in that state, it is important for the person to get help breathing, so he or she may not have brain damage or go into cardiac arrest. Additionally, Dr. Bordelon stated Narcan may not be able to reverse brain damage if it is administered too late.

Lastly, Defendant waived her Fifth Amendment right of self-incrimination and took the stand in her own defense. According to Defendant, she and Ms. Bernard started dating in 2018, and about a year into their relationship, Ms. Bernard admitted to using drugs. Defendant stated she never did drugs and only tolerated Ms. Bernard's drug use because she loved Ms. Bernard. As an effort to help Ms. Bernard's addiction and be closer to Defendant's children, Defendant suggested they move to Eunice. However, Defendant stated she and Ms. Bernard would visit Marksville once or twice a month and stay in one of Ms. Adams' free cabins.

Regarding the purpose of their last visit, Defendant explained she and Ms. Bernard traveled to Marksville so that Ms. Bernard could be seen by her physician as she had not been feeling well. Defendant stated the night prior to the incident, she and Ms. Bernard ate, watched tv, and played with Ms. Bernard's dog, then Defendant went to bed before Ms. Bernard, at around ten o'clock. Regarding the morning of the incident, Defendant testified:

> A.    I woke up Amy was calling to look for her. And the next morning she still wasn't feeling right so she was going to go see the doctor's daughter, she was going to go see her because she said she still wasn't feeling good. And she was going to go rent the cabin for one more night. So when Amy called I thought ... I said I thought she was with you. I said she's not here, I said I just woke up, I said I don't ... so Amy went looking for her after she got off of work.

Q.   And what time did you wake up, do you remember?

A.   It was around like around lunch time I think.

Q.   O.K. And you don't know when she left or?

A.   No.

Q.   Because you were sleeping?

A.   Yes.

Q.   O.K. How many vehicles did ya'll [sic] have at the cabin?

A.   Just one.

Q.   And what kind of vehicle was that?

A.   A Mitsubishi Eclipse.

Q.   Do you know if she told you she was leaving or anything like that?

A.   She just told me she was going to go see Sarah the doctor's daughter. Because she said she wasn't feeling right from the flu shot.

Q.   O.K.

A.   And for her to go rent the cabin again.

Q.   So what happens next with Samantha?

A.   The next thing Amy called me again, she had rode around after work, she found her at Harvest Foods. And so Amy came to get me and we went back to Harvest Foods and she was snoring and sleeping like whenever she would do that. And so we brought her back to the cabin and I just kept checking on her and kept checking on her. I'd go sit in the car and just sit with and wait. I thought she was going to sleep it off (TEARING UP).

Q.   So that whole time you'd go check on her, sometimes you'd sit in the car, you said, right?

A.   Yes, sir.

Q.   When did you first notice that she wasn't breathing?

A.     When I was calling 911, I panicked, she was snoring the whole time I went and check[ed] on her back and forth, back and forth. Went sat in the car for awhile, back and forth. And then when I walked out that last time she wasn't snoring so I started panicking and I'd freeze, I freaked out and I was trying to see because I didn't know she wasn't breathing, I didn't know ... I didn't know. I didn't know she passed away. I just kept ... her face was warm, she was warm, you know.

Q.     What position was she in at that time?

A.     Well she was in the car and she was on her side. So when I was going back and forth I just kept her on her side like that so that if she would throw up or anything, just in case, she wouldn't choke or anything like that. Because I was in and out, in and out going back and forth.

Q.     So she was on the seat though?

A.     Yes

Q.     Sitting in the seat just on her side ...

A.     Sideways like so that she would be like this and not back or anything like that.

Q.     O.K.

Defendant further testified that on previous occasions, Ms. Bernard would sleep between five and six hours after consuming drugs, so she believed that this time would be no different.  Defendant confirmed Ms. Adams' testimony that Ms. Adams periodically called and texted Defendant to check on Ms. Bernard.

On cross-examination, Defendant testified that she had previously left Ms. Bernard in the vehicle while Ms. Bernard was under the influence of drugs. Defendant stated the reason she did not remove Ms. Bernard from the vehicle on the previous occasion was because she was not physically strong enough, as Defendant weighed 120 pounds, and Ms. Bernard weighed 280 pounds.  However, Defendant stated she would check on Ms. Bernard while she slept in the car, as in the instant case.

Defendant testified and elaborated on the other previous occasions when Ms. Bernard would be under the influence of drugs, including a time they traveled from Marksville to Basile, stating Ms. Bernard engaged in drug activity about a month prior to her death, and every time Ms. Bernard would use drugs, she would "slur" her words and then eventually pass out.

After discussing the prior instances related to Ms. Bernard's drug use and binges, Defendant testified that on the day of the incident the weather was nice so she had the car windows rolled down for Ms. Bernard and would frequently check on Ms. Bernard. Defendant stated that the last time she checked on Ms. Bernard she noticed a difference and a distinct change in Ms. Bernard's lip color, so she attempted to find Ms. Bernard's pulse but was unsuccessful due to her lack of medical training, and then Defendant called Ms. Adams and 911 for assistance.

## DISCUSSION AND ANALYSIS

Firstly, we note that there is no jurisprudence as to the sufficiency of the evidence for failure to seek assistance, as La.R.S. Article 14:502 is a relatively new statute that was enacted on August 1, 2018.

*Arguments Presented in Brief*

In her brief, Defendant argues the evidence presented at trial was insufficient to prove beyond a reasonable doubt that, prior to seeking assistance, she knew that Ms. Bernard had suffered serious bodily injury. To support her argument, Defendant contends she closely monitored Ms. Bernard's condition and sought help when she believed medical assistance was now necessary, as she had no knowledge of what type of drugs Ms. Bernard had ingested, she has no medical training, and she was not a drug user. Additionally, Defendant argues that based on her testimony she did not know that Ms. Bernard had suffered serious bodily injury, along with the medical

16

evidence adduced at trial showing that it was typical for a heroin user to "sleep off" the drugs and allow the body to detoxify itself, that the State failed to prove, beyond a reasonable doubt, that she was guilty of failure to seek assistance, death related, and prays for this court to vacate her conviction.

On the other hand, the State contends any rational trier of fact could have found the essential elements of failure to seek assistance proven beyond a reasonable doubt. According to the State, an emergency arose when Ms. Bernard was found unconscious, prompting the need for medical assistance, and that Defendant knew Ms. Bernard was unconscious due to drug abuse. Accordingly, the State asserts all elements of the crime were proven beyond a reasonable doubt.

To support a conviction for failure to seek assistance, death related, under La.R.S. 14:502, the State was required to prove that Defendant: (1) was at the scene of emergency, (2) knew that Ms. Bernard suffered serious bodily injury, (3) failed to give Ms. Bernard reasonable assistance, and (4) the serious bodily injury resulted in Ms. Bernard's death.

As noted above, the State bears the burden of proving, beyond a reasonable doubt, evidence sufficient to show that Defendant possessed sufficient knowledge that Ms. Bernard was suffering "great bodily injury" *and* that Defendant had intentionally failed to seek medical treatment for Ms. Bernard.

Here, the evidence is clear that as to this tragic incident Defendant neither participated in Ms. Bertrand's drug use/binge, nor did she provide Ms. Bertrand with any of the "cocktail" of assorted drugs Ms. Bertrand ingested. Additionally, the testimony of Defendant, as confirmed by Ms. Adams's testimony, shows that in the past it was both their experiences that when Ms. Bertrand used drugs, whether she was in her vehicle, at friend's home, or in her own bed, that she would simply "sleep

it off" and fully recover. In addition, Dr. Tape testified that it was not unusual for a heroin user to "sleep off" the drugs, as in the case of Ms. Bernard. Further, the investigation of the tribal police department, as the death occurred on a reservation, revealed nothing contradicting Defendant and Ms. Adams's testimony. Thus, the undisputed evidence shows that Defendant did not possess sufficient knowledge as to how much or what types of drugs Ms. Bertrand had ingested prior to Defendant and Ms. Adams finding her in her car.

Next, and as to whether Ms. Bertrand suffered an alleged "great bodily injury," the State argues that the evidence shows that Ms. Bertrand was unconscious and, thus, prompting the need for immediate medical assistance. We disagree.

The issue as to whether Ms. Bertrand was unconscious or merely "sleeping it off" again goes directly to the facts of the case and the State's burden of proof, beyond a reasonable doubt, of each element of this crime, including providing sufficient evidence of Ms. Bertrand's "great bodily injury."

The State argues that Ms. Bertrand was "unconscious" and thus provided proof that an "emergency arose" prompting a need for medical assistance. However, a review of the evidence in this case does not bear this out. Both Defendant and Ms. Adams, the only two witnesses as to Ms. Bertrand's condition, testified and confirmed that when they arrived Ms. Bertrand was in her car and she was conscious, breathing and even snoring, and most importantly, **without** any obvious signs of serious physical injury. Specifically, the evidence shows Ms. Bertrand was not experiencing convulsions, foaming at the mouth, bleeding, blue lips, or displaying any other physical signs or symptoms that would cause a rational person to suspect a serious medical emergency was occurring. Further, Defendant and Ms. Adams testified that when Ms. Bertrand was moved back to the cabin that she again was

still conscious, snoring and "sleeping it off," as Ms. Bertrand normally had during her past drug use.

Additionally, and as previously stated, because Defendant did not have any knowledge of the type(s) of drugs consumed by Ms. Bertrand, it was impossible for Defendant, or Ms. Adams, to know how those drugs would react with Ms. Bertrand's body as to this particular "binge." However, whenever Defendant realized that Ms. Bertrand's body and breathing had changed and did indicate acute physical distress, Defendant notified emergency personnel.

While acknowledging that these cases are to be reviewed pursuant to the unique facts of each individual matter, because this statute was recently enacted, a general discussion of its application is helpful in determining how it should be interpreted. Consider this hypothetical: a group of friends are leaving a wedding and when they get to the parking lot they observe a man sprawled next to his vehicle. Someone recognizes the man and explains he has a history of drug use and alcohol abuse. He seems to be unconscious, but as the group approaches, the man is breathing, mumbling, and snoring, but *without* any obvious signs of injury or dire distress. Specifically, the man at this time is not foaming at the mouth, convulsing, bleeding, blue lips, or displaying any other physical symptoms that would cause a rational person to suspect a serious medical emergency was occurring. The group, having no knowledge of the man's activities or the events of this evening, do not call 911 for assistance or take the man to the nearest hospital. However, not wanting to just leave him on the sidewalk, they place the man into his vehicle for him to "sleep it off." Unfortunately, the man dies of a drug overdose that same evening in his vehicle. Under the State's argument, these well-intentioned guests would be guilty of failure to provide assistance and prosecuted for violation of La.R.S. 14:502.

The result of this interpretation would completely undermine the purpose of the statute, which is encouraging persons to provide assistance in service of saving more lives. Instead, it disincentivizes people from offering help and assistance, even when a person has suffered great bodily injury or is in obvious stress.

This interpretation of the application of this statute also ignores the realities of substance abuse in every-day life, i.e., the problems and burdens that are placed upon families, friends, spouses, acquaintances, law enforcement, innocent bystanders, and the public in general. Furthermore, it imposes criminal liability on individuals when these persons have no independent knowledge, did not participate in the victim's alleged drug use, **and** the victim has no obvious signs of acute physical injury, as in the present case. The interpretation advocated by the State and trial court would impose a burden on bystanders, family members, and the general public to make an instant medical decision, without sufficient information or knowledge, and if wrong, face possible criminal prosecution for failure to provide assistance, thus, in our view leading to absurd consequences not anticipated by the legislature and this statute.

After a thorough review of the record, we find the evidence adduced at trial was insufficient to show Defendant's actual knowledge as to the victim having suffered serious bodily injury, and that Defendant knew Ms. Bertrand ingested sufficient drug(s) that would result in her death by drug overdose on this particular date and thus insufficient to support Defendant's conviction.

Therefore, and in viewing the evidence in the light most favorable to the prosecution, we find that no rational trier of fact could have found Defendant guilty beyond a reasonable doubt of failure to seek assistance in violation of La.R.S. 14:502.

## ASSIGNMENTS OF ERROR NUMBERS TWO AND THREE:

In her remaining assignments of error, Defendant contends the near-maximum sentence received is unconstitutionally excessive, and the trial court failed to impose a sentence reasonably tailored to her considering the facts and circumstances of this case. Based on our finding that the evidence presented does not support Defendant's conviction, we pretermit these assignments of error.[1]

## DECREE

The evidence adduced by the State was insufficient to sustain Defendant's conviction for failure to seek assistance, death related, in violation of La.R.S. 14:502. Therefore, Defendant's conviction is reversed, a judgment of acquittal is entered, and her sentence is vacated.

**CONVICTION REVERSED; JUDGMENT OF ACQUITTAL ENTERED; SENTENCE VACATED.**

---

[1] In spite of these assignments of error being pretermitted, we note the probable merits of Defendant's argument that the sentence was excessive, as Defendant was sentenced to the near maximum four years at hard labor in this case, in spite of the unique facts and circumstances of this case, including the following mitigating factors: defendant's age, medical and physical condition, work history, and lack of any misdemeanor or felony arrests or convictions, along with an extraordinary written note, signed by all six jurors, specifically requesting sentencing leniency by the trial court.

**STATE OF LOUISIANA**

**VERSUS**

**LAURIE ELKINS RICHARD**

**KYZAR, Judge, concurring with additional reasons.**

I agree with the outcome of the decision of my colleagues but write separately to make certain my opinion concerning the statute in question and its application to the unfortunate facts of this case. A life is lost and that is a tragedy in the least. The fact that the victim's loved one is convicted as a result of the death for a non-intentional reaction to the victim's situation as might be called for by this particular statute only enhances the tragedy of this senseless death.

Louisiana Revised Statute 14:502 is the crime for which Defendant was convicted. The statute reads in full as follows:

> A. (1) Any person at the scene of an emergency who knows that another person has suffered serious bodily injury shall, to the extent that the person can do so without danger or peril to self or others, give reasonable assistance to the injured person. Reasonable assistance includes immediately seeking or reporting the need for medical assistance from an appropriate authority.
>
> (2) Any person who engages in reckless behavior that results in the serious bodily injury of any person shall, to the extent that the person can do so without danger or peril to self or others, give reasonable assistance to the person. Reasonable assistance includes immediately seeking or reporting the need for medical assistance from an appropriate authority.
>
> B. For purposes of this Section:
>
> (1) "Appropriate authority" includes:
>
> (a) Any state or local law enforcement agency.

(b) A 911 Public Safety Answering Point as defined in Title 33 of the Louisiana Revised Statutes of 1950.

(c) Emergency medical personnel.

(2) "Reckless behavior" means an activity or behavior in which a reasonable person knew or reasonably should have known that the activity or behavior may result in injury to another, including but not limited to excessive consumption of alcohol, binge drinking, drag racing, consumption of any controlled dangerous substance, acts of hazing, or other similar activity, including activity which is defined as a criminal offense under this Title.

(3) Repealed by Acts 2019, No. 2, § 3.

C. (1) Except as provided in Paragraph (2) of this Subsection, any person who violates the provisions of this Section shall be fined not more than one thousand dollars, imprisoned with or without hard labor for not more than one year, or both.

(2) If the serious bodily injury results in the death of the person, any person who violates the provisions of this Section shall be fined not more than two thousand dollars, imprisoned with or without hard labor for not more than five years, or both.

Defendant was convicted of violating La.R.S. 14:502(A)(1). It is noted that persons who come upon the "scene of an emergency" and who fail to render aid to anyone experiencing "serious bodily injury" are treated the same as persons who engage in reckless behavior with another and that other person experiences serious bodily injury resulting from that reckless conduct, as per La.R.S. 14:502(A)(2). Reviewing the testimony from the committee hearing on March 21, 2018, reveals that the purpose of the bill was to attempt to save the lives of persons engaging in the reckless drinking of alcohol and/or the use of dangerous drugs by penalizing those who participated in the activity with the injured or deceased person and who fail to contact 911 or seek help for fear of reprisal because they too were engaged in the activity along with that person. The statute as enacted does far more than that and is extremely broad. Indeed, in committee, there was an attempt to limit the statute to those participating who fail to seek aid. Apparently, the final version of the

2

law did not do so. Under the present wording of the law, anyone walking down a street in "Any Town" Louisiana, who sees someone passed out, obviously seriously drunk or on drugs, and fails to call 911 can be found guilty and sentenced to prison for up to five years if the situation is deemed to be an emergency, the victim is deemed to suffer serious bodily injury, and the victim ultimately dies. There is arguably "an emergency" and arguably "serious bodily injury" in the broad meaning of those terms. This is far beyond the testimony of the author at the initial committee hearing on the underlying bill as to the intent of the law. The law, under subpart (A) leaves much unanswered for the average person who must conform his or her conduct accordingly. What is an "emergency" or the "scene of an emergency?" The law does not define such, nor does it state that a reasonable man standard applies to determine what is an emergency. Indeed, in La.R.S. 14:502(B)(2) the legislature applied a reasonable man standard to the definition of "reckless behavior," yet it did not do so with the phrase "scene of an emergency" or even what may or may not be perceived as "serious bodily injury" in La.R.S. 14:502(A)(1). Thus, it must be presumed that it is the perception of the defendant charged with the offense as to whether the scene encountered was an emergency, or whether there was serious bodily injury. Criminal statutes must be read in the narrowest fashion and must be construed in the light most favorable to the defendant under principles of lenity. *State v. Carr*, 99-2209 (La. 5/26/00), 761 So.2d 1271.

> It is a well-established tenet of statutory construction that criminal statutes are subject to strict construction under the rule of lenity. *State v. Carouthers*, 618 So.2d 880, 882 (La.1993). Thus, criminal statutes are given a narrow interpretation and any ambiguity in the substantive provisions of a statute as written is resolved in favor of the accused and against the State. *State v. Becnel*, 93-2536, p. 2 (La.5/31/96), 674 So.2d 959, 960; *Chevalier v. L.H. Bossier*, 95-2075, p. 6 (La.7/2/96), 676 So.2d 1072, 1076 (citing *State v. Piazza*, 596 So.2d 817, 820 (La.1992)). The principle of lenity is premised on the idea that a person should not be criminally punished unless the law provides a fair warning of what conduct will be considered criminal.

3

> *State v. Piazza*, 596 So.2d 817, 820 (La.1992) (citing 3 N. Singer, *Sutherland Statutory Construction* § 59.04 (Sands 4 th ed.1986)). The rule is based on principles of due process that no person should be forced to guess as to whether his conduct is prohibited. *Id.* (citing *Dunn v. United States*, 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979)).

*Id.* at 1274.

On the other hand, if the provision setting forth that when coming on the "scene of an emergency" where another is suffering "serious bodily injury," is unambiguous, the rule of lenity is inapplicable. *State v. Turner*, 18-780, p. 4 (La. 5/8/19), 283 So.3d 997 (per curiam).

> "The general rule that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity applies when the court is uncertain about the statute's meaning and is 'not to be used in complete disregard of the purpose of the legislature.' " *State v. Brown*, 03-2788, pp. 5-6 (La. 7/6/04), 879 So.2d 1276, 1280 (quoting *Perrin v. United States*, 444 U.S. 37, 49 n.13, 100 S.Ct. 311, 317, 62 L.Ed.2d 199 (1979)). A court should not "blindly incant the rule of lenity to 'destroy the spirit and force of the law which the legislature intended to and did enact.' " *Huddleston v. United States*, 415 U.S. 814, 832, 94 S.Ct. 1262, 1272, 39 L.Ed.2d 782 (1974) (quoting *American Tobacco Co. v. Werckmeister*, 207 U.S. 284, 293, 28 S.Ct. 72, 52 L.Ed. 208 (1907)). In the present case, although defendant has articulated a narrower construction, we find that the statute is unambiguous, and therefore the rule of lenity does not apply.

*Id.* at 999–1000.

I believe the terms within the statute are ambiguous in that its application can be so broadly read that it can or may apply to many situations where it was not intended to so apply. Is the perception of the actor or non-actor or that of a reasonable person used in interpreting the provisions? That question is unanswered. I might define emergency differently than another. I might consider whether one is experiencing serious bodily injury different from another, especially the term "unconsciousness" as used in La.R.S. 14:2(C). Is a person that is "out of it" mentally but has his or her eyes half open and is moaning, unconscious? One person might

think so, another not, depending on the personal background and history of both the onlooker and the victim. Thus, the rule of lenity must be applied here.

In this case, Defendant did not perceive her initial encounter with the victim to be an emergency. She had seen this pattern repeat itself over and over. The victim was addicted to drugs. She routinely got high, passed out, slept it off, and woke up to go on with her life. Defendant saw nothing different initially. During her uncontested testimony, Defendant stated that the point at which she perceived an emergency was occurring when she noticed a difference in the victim's condition and her lips had turned blue. She called Ms. Adams and then called 911 as required by La.R.S. 14:502(A)(1).

Black's Law Dictionary defines "emergency" as "[a] sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm[]" or as "[a]n urgent need for relief or help." Black's Law Dictionary (11th ed. 2019). HealthCare.gov, an official website of the United States government, defines "emergency medical condition" as "[a]n illness, injury, symptom or condition so serious that a reasonable person would seek care right away to avoid severe harm."[1] As observed above, Defendant recognized a change in the victim's circumstances calling for immediate action when she noticed that her condition had become serious. At that point, she began the seeking help, by first calling Ms. Adams and then calling 911.

It is obvious that the jury applied a broad reading of the law, as would most lay persons not being given further guidance, and as a result, it felt that it had no alternative other than a guilty verdict. Given the wording of the statute, the jury can hardly be faulted for doing so. An instruction that a narrow reading of the law is

---

[1]https://www.healthcare.gov/glossary/emergency-medical-condition/#:~:text=An%20illness%2C%20injury%2C%20symptom%20or,away%20to%20avoid%20severe%20harm.

5

required may indeed have made a difference in that outcome. It was not requested or given. However, the law of statutory construction in the criminal law realm must be applied. The jury obviously sensed the incongruencies present in the statute based on its request for leniency in the note to the trial court accompanying the verdict.

Following the law, we must give a narrow interpretation of the statute, and in doing so, we must look to the perception of Defendant at the time she encountered the victim initially and throughout the remaining time she monitored her condition. When she perceived an emergency, she contacted 911. The evidence was thus insufficient under these facts to establish her guilt beyond a reasonable doubt.