FILED
08/07/2025
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 24, 2025

**STATE OF TENNESSEE v. KENTREL MORAGNE**

**Appeal from the Criminal Court for Shelby County**
**No. 22-04285       James Jones, Jr., Judge**

_____

**No. W2024-01684-CCA-R3-CD**

_____

Kentrel Moragne, Defendant, appeals from his conviction for unlawful exposure for which he received a sentence of eleven months and twenty-nine days. The trial court ordered Defendant to serve fourteen days in incarceration and the remainder of the sentence on probation. Defendant challenges the sufficiency of the evidence in this timely appeal. Because the statute is not ambiguous and the evidence was sufficient to support the conviction, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which MATTHEW J. WILSON and STEVEN W. SWORD, JJ., joined.

Phyllis Aluko, District Public Defender; Michelle Whitman and Terrence Tatum, Assistant District Public Defenders (at trial); and Barry W. Kuhn, Assistant District Public Defender (on appeal), for the appellant, Kentrel Moragne.

Jonathan Skrmetti, Attorney General and Reporter; Johnny Cerisano, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Karin Morris and Alicia Walton, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In September of 2022, the Shelby County Grand Jury indicted Defendant on one count of unlawful exposure. At Defendant's jury trial, the following evidence was introduced by the State.

The victim met Defendant on a dating website called "Plenty of Fish." She thought Defendant was "nice" and "manly." He treated her with "respect." The two chatted for some time through the website before meeting and going to a hotel for sex. One month after their first date, they became exclusive. The victim said their relationship progressed "fast and good" and went "well" in the beginning. They met each other's families and even attended family events together as a couple.

The victim explained that about three months after they started dating, the victim shared "images of [herself] being naked, images of [herself] with [her] clothes on" with Defendant. She sent these images to Defendant's phone "[b]ecause [she] knew it would make his day." Sometimes she sent the images spontaneously and sometimes Defendant asked her to send them. The images depicted her face, vagina, breasts, underwear, side, and she sent at least one video. The victim understood that they "were personally for him only, for no one else to see." Defendant did not take any of the images.

About a year-and-a-half into the relationship, the victim became pregnant with Defendant's child. In July of 2021, her father died. She had a miscarriage in September of the same year when she was around fourteen weeks pregnant. Defendant was present for her father's funeral and "repass" and "went to doctor[']s appointments" when she was pregnant. She was happy about being pregnant and the couple even discussed "[b]aby names." After the miscarriage the relationship started "going downhill" and Defendant "started becoming more of a[n] angry person."

The victim testified that on December 21, 2021, "about three months" after the miscarriage, the couple argued on the way to get their hair done. Defendant asked her if she was "seeing somebody else." The victim told him "no," but Defendant thought she was "lying." Defendant told her to "turn around and go back home," so she complied. Defendant was calling her "all types of bi***es and hoes" and told her he should "hit" her with "this." The victim looked down and "his hand was on his gun." The victim did not know if Defendant meant he wanted to hit her with his hand or with his gun. They got to the victim's home a few minutes later.

The argument "led to [Defendant] being upset with [the victim] and taking things out on [her] and pictures, nude pictures and regular pictures too, he put them - - well he sent screen shots to [her] on [her] phone threatening . . . that he was gonna expose [her] on a porno website." The victim looked online and "there it was, and it was multiple pictures and a few videos" of her body. Under one of the videos that was uploaded to a pornography website, there was a caption that read, "[The victim] disease p***y a** hoe" and included the victim's phone number. When the victim "Googled" her name, "it popped up all these different pornographic websites with [her] phone number." Some of them had her address

and Facebook username as well. The victim was able to get in touch with the creator of one website, "X Videos," and asked him to take the images and videos down. The victim admitted that some of the poses were "sexual" and some very "very intimate," but all of them were shared with Defendant with the understanding that they were private. The victim felt "betrayed." The victim identified her body in the images and screenshot from the video.

Defendant sent the victim a text that said she was a "bad body built b**ch, woo, and also [a] diseased p***y a** hoe." Defendant sent her about "a hundred" messages via phone and Facebook Messenger. One of the messages was a "screen shot of, like, before he pressed send on the pornographic website. It was a screen shot of [the victim] being naked." The victim asked Defendant to "take them down[,]" but Defendant did not comply. The victim read some of the messages she received from Defendant into the record, including the caption under one of the images Defendant sent to her, which read, "[The victim] ugly fat b****h from Memphis." Defendant's actions made her "feel like [she] couldn't trust anybody." All of her personal information, including her phone number, was posted online. The victim explained that she had to change jobs, felt paranoid, and felt "in danger." Defendant refused to take the photographs down, messaging the victim that she "want[ed] to be online so bad, let me help you putting the videos up for your garbage a** hoe."

Defendant messaged the victim that she "scammed" him out of $500 and gave him a disease. The victim explained that Defendant "gave" her $500 because she was not working and that she and Defendant got tested for STDs in October and she was free of any disease. The victim explained Defendant tested positive for "[h]erpes." The victim knew that Defendant was unfaithful during their relationship, but she decided to give him "another chance." The victim explained that she "really loved" Defendant and was never unfaithful to him during their relationship. The victim eventually blocked Defendant on Facebook so she could no longer receive messages from him.

After two days, the victim was able to get her pictures off at least one website by contacting the website and the police.

On cross-examination, the victim admitted that she never sent Defendant any type of text message or Facebook message stating that the photos and videos were private. The victim testified that she verbally told Defendant the images were private. The victim admitted that she told Defendant she slept with someone else during their relationship but claimed that she lied to him to put herself "in his brain."

- 3 -

Sergeant Michael Davis interviewed the victim. She picked Defendant out of a photo lineup. He drafted an arrest warrant based on the victim's statements. The investigation revealed that her boyfriend posted nude photos of her online.

Defendant did not testify or present any additional proof.

The jury found Defendant guilty. After a sentencing hearing, the trial court sentenced Defendant to fourteen days in confinement and eleven months and fifteen days on supervised probation. After the denial of a motion for new trial, Defendant filed a timely notice of appeal.

*Analysis*

On appeal, Defendant argues that the evidence is insufficient to convict him of unlawful exposure. Specifically, Defendant argues the evidence did not show that the images were "photographed or recorded under circumstances where the parties agreed or understood that the image[s] would remain private." Defendant complains that he was not present when the photos were taken and there is no testimony that Defendant agreed or understood not to share the images. Defendant also alleges that the statute is ambiguous and that this is a case of first impression. The State, on the other hand, argues that the evidence was sufficient where the victim sent nude photos of herself to Defendant with the mutual understanding that they would remain private. Then, Defendant and the victim argued, and Defendant posted the private nude photos and videos of her on a pornography website, causing the victim emotional distress. The State also counters that the statute is not ambiguous.

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see also State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011); Tenn. R. App. P. 13(e). "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden is shifted to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which

may be drawn therefrom." *Id*. at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Therefore, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

Defendant was convicted of violating Tennessee Code Annotated section 39-17-318, which provides that a person commits unlawful exposure "who, with the intent to cause emotional distress, distributes an image of the intimate part or parts of another identifiable person or an image of an identifiable person engaged in sexually explicit conduct" where "(1) [t]he image was photographed or recorded under circumstances where the parties agreed or understood that the image would remain private; and (2) [t]he person depicted in the image suffers emotional distress."[1]

So, in order to sustain a conviction for unlawful exposure, the State had to prove the following elements: (1) Defendant had the intent to cause emotional distress; (2) Defendant distributed an image of the intimate part of the victim or an image of the victim engaged in sexually explicit conduct; (3) the image was photographed or recorded under circumstances where the parties agreed or understood the image would remain private; and (4) the victim suffered emotional distress.

On appeal Defendant challenges the sufficiency of the evidence to prove whether the images were photographed or recorded under circumstances where the parties agreed or understood the image would remain private. We first address Defendant's assertion that the statute is ambiguous. Defendant argues that the phrase "under circumstances" creates an ambiguity in the statute because it is not clear if the jury "is to decide whether 'under circumstances' means whether an ordinary reasonable person would consider the circumstances were such that an agreement was reached, or whether it means that there must be words spoken or actions taken that would indicate that there was an agreement." Defendant argues this uncertainty calls for the application of the rule of lenity such that we resolve the ambiguity in Defendant's favor. Defendant also argues that the statute is ambiguous as to when the agreement for the images to remain private must be made – at the time the images were created or at some other time.

---

[1] Section (1) of the statute was amended effective July 1, 2025 to read, "[t]he image was photographed or recorded under circumstances where the parties agreed or understood that the image would remain private, *regardless of whether the person who distributes the image was a party to the agreement or understanding* . . . ." T.C.A. § 39-17-318(a)(1) (Emphasis added).

To support his argument, Defendant cites *Pagliara v. Moses*, 605 S.W.3d 619 (Tenn. Ct. App. 2020). In this civil case, a husband filed suit against his ex-wife and the law firm that represented her in a divorce proceeding for malicious prosecution, civil conspiracy, intentional infliction of emotional distress, and negligent infliction of emotional distress related to a police report filed against him by his wife. *Id.* Prior to their marriage, the ex-wife met a man at a hotel and videotaped a sexual encounter. After their marriage, the husband received a video and text message video of the encounter from the wife of the man on the video. The husband sent the video to both his wife and close friends. The ex-wife sought criminal charges against the husband under Tennessee's "revenge porn" statute, Tennessee Code Annotated section 39-17-318(a). *Id* at 623-24. The husband argued that the statute was not relevant to him "because he was not a party to the videotape or photograph and he had not agreed to keep the images private." *Id.* at 623. The husband argued he had to hire someone to defend the criminal charge; that his lawyer notified the district attorney's office of the deficiencies in the prosecution and problems with venue (based on the fact that the message was sent when the husband was in California). *Id.* The criminal case was transferred to a police department in California and the case was eventually closed, according to the husband, because he "did not violate any applicable criminal law." *Id.* The ex-wife filed a motion to dismiss the civil case, which the trial court granted. *Id.* at 619. On appeal, the court of appeals determined that it was "not necessary to address whether probable cause existed to support a prosecution under . . . Tennessee Code Annotated [section] 39-17-308 because a 'prior suit or judicial proceeding' had not been instituted against" the husband. In fact, the court noted that the husband was not even being investigated for violating Tennessee Code Annotated section 39-17-308, but instead for section 39-17-902. *Id.* at 623 n.2. The court of appeals affirmed the trial court's grant of the motion to dismiss, in part because there was nothing other than a criminal investigation and nothing to support a claim for malicious prosecution. *Id.* at 626-27.

While we acknowledge that this case cites the statute Defendant was convicted of violating, we find the similarities end there. The husband in *Pagliara* was neither charged with nor convicted of violating that statute. *Id.* Therefore, we find *Pagliara* inapplicable. We do agree with Defendant, however, that this case seems to be a case of first impression.

"The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *State v. Howard*, 504 S.W.3d 260, 269 (Tenn. 2016) (quoting *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995)); *Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009) (citing *State v. Sherman*, 266 S.W.3d 395, 401 (Tenn. 2008)). When this Court is tasked with construing statutes, Tennessee law provides that we are to avoid a construction that leads to absurd results. *Tennessean v. Metro. Gov't of Nashville*, 485 S.W.3d 857, 872 (Tenn. 2016) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010)).

"Furthermore, the 'common law is not displaced by a legislative enactment, except to the extent required by the statute itself.'" *Wlodarz v. State*, 361 S.W.3d 490, 496 (Tenn. 2012) (quoting *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 679 (Tenn. 2002)), *abrogated on other grounds by Frazier v. State*, 495 S.W.3d 246 (Tenn. 2016). As the Tennessee Supreme Court recently explained:

> This Court's role in statutory interpretation is "to determine what a statute means." *Waldschmidt v. Reassure Am. Life Ins. Co.*, 271 S.W.3d 173, 175 (Tenn. 2008). Specifically, we must decide "how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 33 (2012). Original public meaning is discerned through consideration of the statutory text in light of "well-established canons of statutory construction." *State v. Sherman*, 266 S.W.3d 395, 401 (Tenn. 2008); *see also Kisor v. Wilkie*, ___ U.S. ___, 139 S. Ct. 2400, 2442, 204 L. Ed. 2d 841 (2019) (Gorsuch, J., concurring in the judgment) (noting that judges have employed "traditional tools of interpretation . . . for centuries to elucidate the law's original public meaning").

> We give the words of a statute their "natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." *Ellithorpe v. Weismark*, 479 S.W.3d 818, 827 (Tenn. 2015) (quoting *Johnson v. Hopkins*, 432 S.W.3d 840, 848 (Tenn. 2013)). In the absence of statutory definitions, we look to authoritative dictionaries published around the time of a statute's enactment. *State v. Edmondson*, 231 S.W.3d 925, 928 & n.3 (Tenn. 2007).

> We consider the whole text of a statute and interpret each word "so that no part will be inoperative, superfluous, void or insignificant." *Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d 216, 228 (Tenn. 2010) (quoting *Tidwell v. Collins*, 522 S.W.2d 674, 676 (Tenn. 1975)). We also consider "[t]he overall statutory framework." *Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, 574 S.W.3d 832, 846 (Tenn. 2019). "[S]tatutes 'in pari materia'—those relating to the same subject or having a common purpose—are to be construed together . . . ." *Wilson v. Johnson Cnty.*, 879 S.W.2d 807, 809 (Tenn. 1994).

> . . . .

When a statute's meaning is clear and unambiguous after consideration of the statutory text, the broader statutory framework, and any relevant canons of statutory construction, we "enforce the statute as written." *Johnson*, 432 S.W.3d at 848. But when a penal statute remains "grievous[ly] ambigu[ous] or uncertain[ ]," *Huddleston v. United States*, 415 U.S. 814, 831, 94 S. Ct. 1262, 39 L. Ed. 2d 782 (1974), the rule of lenity operates as a "tie-breaker" and requires us to resolve the ambiguity in the defendant's favor, *State v. Welch*, 595 S.W.3d 615, 623 n.4 (Tenn. 2020) (quoting *State v. Marshall*, 319 S.W.3d 558, 563 (Tenn. 2010)).

*State v. Deberry*, 651 S.W.3d 918, 924-25 (Tenn. 2022).

Defendant complains that he never agreed or understood that the photos would stay private and that the term "under circumstances" is ambiguous. While "under circumstances" is not defined in the Code, the words are capable of ready understanding by looking to "authoritative dictionaries." *Deberry*, 651 S.W.3d at 925 (citing *Ellithorpe*, 479 S.W.3d at 827). "Under circumstances" refers to conduct that occurs in a "a particular situation," here the factual situation established by the testimony at trial. *See* https://www.dictionary.com/browse/under-the-circumstances#related-words. In fact, our research revealed that the phrase "under circumstances" is used quite routinely throughout the criminal code without being defined by the legislature. *See e.g.*, T.C.A. §40-35-114 (listing enhancement factors, including (17) "[t]he crime was committed under circumstances under which the potential for bodily injury to a victim was great"); T.C.A. §39-14-149 (listing definitions for communication theft to include the sale, possession, or delivery to another or offer for sale any communication device "under circumstances evincing an intent to use the communication device . . . ."); T.C.A. §39-17-425 (making it illegal to possess drug paraphernalia "under circumstances where one reasonably should know, that it will be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance or controlled substance analogue in violation of this part" except when done by a person authorized by statute to do so); T.C.A. §39-15-301 (defining bigamy as occurring when a person who "[i]s married and purports to marry or be married to a person other than the person's spouse in this state under circumstances that would, but for the person's existing marriage, constitute a marriage . . . ."). Such frequent usage, without definition, in our view, indicates that the legislature intended for the words to be used in their natural and ordinary meaning. *Deberry*, 651 S.W.3d at 924-25.

Here, the jury heard the proof at trial and then was tasked with determining whether the facts as presented at trial were such that it was understood that the images were private in nature. We see no ambiguity when applying the statute to the facts. The jury heard the

- 8 -

victim testify that she sent the photos to Defendant for his eyes only.  The photos were sent to Defendant approximately three months into a two-year relationship.  The two were in an exclusive relationship when the photos were sent to Defendant, and Defendant only publicized the photos after their relationship was over.  Defendant's sharing of the photos only after the end of the relationship indicated he understood that the photos were private in nature.  The content of the sexually explicit photos and the victim's response to the publication of the photos tend to show that the photos were meant to remain private.  Moreover, there is no requirement in the statute, as suggested by Defendant, that the agreement or understanding of privacy occur at the moment the photos were created or recorded.

Because we have determined that the statute is not ambiguous, we can now determine whether the evidence supported the conviction.  Viewing the evidence in a light most favorable to the State, the proof at trial showed that Defendant intended to cause emotional distress to the victim by publicly distributing photos and videos of her intimate parts when the victim sent the photos to Defendant under circumstances where the parties agreed or understood that they were to remain private.

The record supports that the victim suffered emotional distress.  The victim testified that she sent the photos to Defendant during their exclusive relationship and that she told Defendant they were for his eyes only.  They had an argument that ended the relationship.  Only then did Defendant post photos and videos to a publicly accessible pornography website along with the victim's contact information and derogatory comments about the victim.  When the victim asked Defendant to take the photos down, Defendant told her she wanted "to be online so bad" that he would "help [her by] putting the videos up for your garbage a** hoe."  The victim testified that she switched jobs after the incident and stopped going to the grocery store in part because she was afraid of "creeps" that might have seen the images.  The evidence was sufficient to support the conviction.  Defendant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

s/Timothy L. Easter
TIMOTHY L. EASTER, JUDGE

- 9 -